370 F.Supp.2d 18 (2005)
UNITED STATES of America ex rel., ERVIN AND ASSOCIATES, INC., Plaintiff,
v.
THE HAMILTON SECURITIES GROUP, INC., et al., Defendants.
No. CIV.A.96-CV-1258 LFO, No. CIV.A.99-CV-1698-LFO.
United States District Court, District of Columbia.
January 25, 2005.
*19 *20 *21 *22 Aaron L. Handleman, Eccleston & Wolf, Washington, DC, Joseph P. Hornyak, Sonnenschein Nath & Rosenthal, Washington, DC, Michael Philip Freije, Eccleston & Wolf, Washington, DC, Renee Catherine Macri, Sonnenschein Nath & Rosenthal, Washington, DC, for Ervin and Associates, Inc.
Brian Arthur Coleman, Kenneth E. Ryan, Michael J. McManus, Drinker, Biddle & Reath, Washington, DC, for Hamilton Securities Group, Inc., Hamilton Securities Advisory Services, Inc.
Wayne Gormly Travel, Leach Travel, Vienna, VA, for Daniel M. Hawke.
Pamela Anne Bresnahan, Vorys, Sater, Seymour & Pease, Washington, DC, for Neil V. Getnick, Getnick and Getnick.
*23 Kevin T. Baine, Williams & Connolly LLP, Washington, DC, for Lorraine Adams.
Laura Rose Handman, Davis Wright Tremaine LLP, Washington, DC, for Carl Johnston, Timothy M. Ito, Edward T. Pound.
Allen Vern Farber, James Aston Barker, Gardner, Carton & Douglas, WashingtoN, DC, for George Archibald.

SUPERSEDING MEMORANDUM
OBERDORFER, District Judge.
The instant qui tam action was filed on June 6, 1996, on behalf of the United States by plaintiffs John Ervin and Ervin Associates, Inc. (collectively, "Ervin") against several entities, including Hamilton Securities Group, Inc. ("Hamilton"). Over the course of four days of trial in October 2003, Ervin submitted testimony and documentary evidence against Hamilton and rested. Thereupon, Hamilton moved for Judgment on Partial Findings under Federal Rule of Civil Procedure 52. A January 7, 2004 Order granted the motion with respect to Count VII of the Second Amended Complaint, related to the West of Mississippi note sale. [Dkt. No. 198]. The Order also granted the motion with respect to Counts I, III, IV, V, VI, and VIII of the Second Amended Complaint on the grounds that Ervin failed to identify or introduce evidence, in either its pretrial statement or at trial, in support of the allegations contained in these Counts. Id. The Order denied Hamilton's motion with respect to Count IX (related to the North and Central note sale), Count II (related to the Single Family Offering), Counts XIII and XIV (related to the Williams, Adley 8(a) contract), and Counts XV and XVI (related to the crosscutting contract). Id.
Over three trial days in July 2004, Hamilton presented its trial defense. Ervin did not put on a rebuttal. Following the completion of the trial, the parties submitted modified proposed findings of fact and conclusions of law. An August 16, 2004 Order and Partial Judgment ruled that (1) Ervin is entitled to Judgment on Count IX of the Second Amended Complaint  related to the North Central Sale, (2) the amount of damages caused to the United States by Hamilton's False Claim on the North-Central sale was $1,511,244.00, and (3) Hamilton is entitled to Judgment on the counts related to the three remaining issues: Count II, related to the Single Family Offering, Counts XIII and XIV, related to the Williams 8(a) contract, and Counts XV and XVI, related to the crosscutting contract. [Dkt. No. 452]. The Court's Order and Partial Judgment also ordered supplemental briefing "addressing (1) the proper penalty to be assessed under 31 U.S.C. § 3729; and (2) the proper division of payment as between Ervin and the United States." Id. The parties and the United States filed briefs in response. See Hamilton's Mem. Regarding Proper Penalty, filed Aug. 27, 2004 [Dkt. No. 454]; Joint Suppl. Brief of the United States and Ervin, dated Aug. 16, 2004, filed Aug. 26, 2004 [Dkt. No. 455]; Suppl. Report by United States, filed Oct. 13, 2004 [Dkt. No. 460]. Having considered the trial testimony and documents offered by both parties, and having reviewed the above-recited pleadings, the Court enters the following Memorandum and accompanying Order, granting judgment for plaintiffs John Ervin and Ervin Associates, Inc. on Count IX of the Second Amended Complaint and granting judgment for defendant Hamilton Securities Group, Inc. on Counts II, XIII and XIV of the Second Amended Complaint. The amount of damages assessed against Hamilton is $4,533,732.00 plus a $5,000.00 penalty, for a total damage *24 award of $4,538,732.00. This Memorandum supersedes the Court's Memorandum filed on August 16, 2004. [Dkt. No. 452].

I. FINDINGS OF FACT
A. Background
Throughout the 1970s and 1980s, the United States Department of Housing and Urban Development ("HUD"), as part of an effort to promote broad home ownership, insured the mortgages of certain individuals and entities for whom private financing was not feasible. United States ex rel. Ervin & Assoc., Inc. v. Hamilton Sec. Group, 298 F.Supp.2d 91, 93 (D.D.C.2004) [hereinafter, "Jan. 7, 2004 Mem."]. HUD often assumed control of and responsibility for the mortgages if the insured individuals and entities failed to make the mortgage payments. Id. In so doing, HUD accumulated a portfolio of over $408 billion dollars by September 1993. Id. This massive real estate management responsibility interfered with HUD's ability to discharge its various other responsibilities. Id. In 1993, in order to allow HUD to "better fulfill its mission," HUD initiated a program to restructure its portfolio. Hamilton Ex. 7 at HUD/EE 817. HUD sought to sell its inventory of single family and multifamily HUD-held mortgages and HUD-held properties. See id. Because HUD had never before engaged in a massive sell-off of mortgage assets and did not have the in-house expertise to manage such a project, HUD decided to contract the note sale operations to the private sector. See id. Fair Housing Authority's Commissioner, Nicolas Retsinas, assigned Helen Dunlap, HUD's Deputy Assistant Secretary for Multifamily Housing, to oversee the design of the loan sales program. Tr. 7/20/2004 AM at 120, ln. 17-19.
Subsequently, on September 30, 1993, HUD awarded the "first financial advisor contract" to Hamilton. See Hamilton Ex. 8. Under the contract, Hamilton designed and developed the blueprint for selling HUD-held mortgage notes through public auctions. See Hamilton Ex. 8; Tr. 11/3/2003 AM at 259, ln. 2-14; id. at 331, ln. 22  332, ln. 3; Tr. 7/20/2004 AM at 122, ln. 16-22. Additionally, Hamilton's responsibilities in its role as financial advisor to HUD included "all aspects of running asset sales and getting supportive services to assist in doing that such as conducting analyses, strategizing approaches to sales, [and] due diligence." Tr. 10/29/03 PM at 13, ln. 5-16. Hamilton, in turn, employed Bell Labs (now Lucent Technologies) as a subcontractor to develop and run an optimization model to assist in the mortgage note sales. Tr. 10/30/03 PM at 114, ln. 11-15. The optimization model was a computer-operated algorithm designed to select as winners that combination of bids which, if accepted, would produce the maximum potential revenue to HUD. Jan. 7, 2004 Mem. at 5. Hamilton also retained Coopers & Lybrand to manage security and bid processing for the auctions. Id. at 6.
B. Williams, Adley 8(a) Contract
1. Small Business Administration Section 8(a) Program
In 1994, HUD decided to procure due diligence services for its loan sales program from a minority-owned contractor through the Small Business Administration Section 8(a) program. The purpose of the Section 8(a) program is to assist small and socially disadvantaged businesses. Tr. 10/29/2003 PM at 8, ln. 18-22. To this end, the Section 8(a) program waives many of the competitive requirements in traditional government procurement regulations. Tr. 10/30/2003 AM at 115, ln. 22  116, ln. 4. Thus, the Section 8(a) program permitted HUD to procure services from a single *25 contractor without competitive bidding. Id.
2. Williams, Adley Vies for HUD Due Diligence Contract
In the fall of 1994, HUD contacted Williams, Adley & Company ("William, Adley"), a certified Section 8(a) contractor, and requested an in-person presentation of Williams, Adley's due diligence capabilities. Tr. 7/19/2004 at 86, ln. 19-22. At the time, Williams, Adley was a certified public accounting firm that provided a variety of accounting services, including due diligence to government agencies. Id. at 83, ln. 21-25. Williams Adley had previously provided due diligence and financial advisory services to HUD. Id. at 84, ln. 19  85, ln. 2. Contemporaneously, HUD solicited presentations from at least two other due diligence contractors. Tr. 7/20/2004 at 139, ln. 11-14; id. at 140, ln. 15-18. On October 7, 1994, HUD selected Williams, Adley as the "8(a) firm of choice" and provided a Request for Proposal. Tr. 7/19/2004 at 89, ln. 17-19; Williams, Adley Ex. 20. According to Helen Dunlap, HUD's Deputy Assistant Secretary, HUD selected Williams, Adley because "they were the most experienced of the [sic], at the kinds of things we were looking for of the firms, and they also had the most and we perceived it [sic] had capacity and they had good recommendations...." Tr. 7/20/2004 at 140, ln. 1-5. Hamilton did not recommend Williams, Adley to HUD, or otherwise participate in the Section 8(a) contractor selection process. Id. at ln. 19-24. On October 26, 1994, Williams, Adley responded to HUD's Request for Proposal, submitting both technical and cost proposals. Tr. 7/19/2004 at 90, ln. 22  91, ln. 10; Williams, Adley Exs 23, 24. Hamilton was not named as a potential subcontractor under the Section 8(a) contract in Williams, Adley's technical proposal. Williams, Adley Ex. 24.
3. Williams, Adley Vies for HUD's Financial Advisory Services Contract
HUD subsequently asked Williams, Adley about its capabilities to perform financial advisory services in connection with the loan sales program. Tr. 7/19/2004 at 92, ln. 10-12. HUD informed Williams, Adley that they needed a "stop gap measure" until they had a new financial advisory contract in place. Id. at 94, ln. 13-18. Williams, Adley previously had contracted to provide financial advisory services under other HUD contracts, and in turn, had subcontracted that work to other firms. Id. at 84, ln. 24  85, ln. 2. Henry Adley ("Adley"), a partner at Williams, Adley, contacted financial advisors at Kenneth Leventhal, Ernst & Young, Chemical Bank and Hamilton in preparing a response to HUD's financial advisory services request. Id. at 93, ln. 10-17; id. at 94, ln. 23. According to Adley, he identified Kenneth Leventhal, Ernst & Young and Chemical Bank because he had previously worked with each of them. Id. at 93, ln. 10-17. Adley learned of Hamilton's role in the design and development of the loan sales program prior to submitting its initial proposals because he wanted to know of the major "stakeholders" in the loan sales process. Id. at 93, ln. 20  94, ln. 12. Williams, Adley had at least one discussion with Hamilton employee Robert Robinson prior to submitting its revised technical and cost proposals. Tr. 10/31/2003 PM at 191, ln. 13-18. Adley testified that "after careful consideration in looking at the qualifications" of the firms, Williams, Adley selected Hamilton as one of its teaming partners. Id. at 95, ln. 16-17. No one at HUD steered Williams, Adley towards Hamilton. Id. at ln. 1-22. On November 2, 1994, Williams, Adley submitted revised technical and cost proposals identifying a *26 number of potential subcontractors, including Hamilton. Id. at 96, ln. 1-5; Tr. 10/29/2003 PM at 35, ln. 15-20; id. at 47, ln.7  48, ln. 2; Tr. 10/30/2003 AM at 115, ln. 14-18; Williams, Adley Exs. 26, 27.
4. HUD Awards Williams, Adley Section 8(a) Contract
On or about December 7, 1994, HUD awarded Williams, Adley a Section 8(a) "indefinite delivery, indefinite quantity" contract. Hamilton Ex. 10 at 2; Tr. 10/29/2003 PM at 39, ln. 11. The contract defined the basic arrangement, setting out the broad base of tasks and responsibilities that HUD required. Tr. 10/29/2003 PM at 39, ln. 15  40, ln. 3. Specific work requirements were to be defined at later dates, through statements of work and the award of task orders, against the basic indefinite quantity contract. Id. The subsequent statements of work were the subject of further negotiations between HUD and Williams, Adley. Id.
HUD contracting officer Annette Hancock knew Hamilton was serving as financial advisor to HUD on the loan sales program both when Williams, Adley submitted its revised proposal and when the Section 8(a) contract was awarded. Tr. 10/30/2003 AM at 110, ln. 2-8; id. at 115, ln. 19-21. Hancock testified that she ensured that the appropriate policies and procedures were adhered to and complied with in the award of the Section 8(a) contract. Id. at 109, ln. 23  110, ln. 1. At the time HUD awarded the Section 8(a) contract to Williams, Adley, Hancock understood that Williams, Adley "would solicit services from various vendors who provide whatever those supportive services that William, Adley needed to augment their resources." Tr. 10/29/2003 PM at 49, ln. 24  50, ln. 10. Specific subcontractors would be identified when Williams, Adley submitted proposals for task orders identifying the team Williams, Adley thought appropriate to perform the work. Id. at 45, ln. 25  46, ln. 4. HUD never indicated any dissatisfaction with Williams, Adley's subcontractor selection process. Tr. 7/19/2004 at 100, ln. 12-17.
5. Hamilton Drafts Statements of Work for Potential Task Orders
As HUD's financial advisor under the First Financial Advisor contract, Hamilton was tasked with helping HUD develop and design the entire loan sales program. Tr. 11/3/2003 AM at 331, ln. 22  332, ln. 3. In this role, Hamilton drafted statements of work and task orders, including task orders for financial advisory services under the Section 8(a) contract. Tr. 11/3/2003 AM at 262, ln. 9-13; id. at 332, ln. 22  333, ln. 4. HUD reviewed Hamilton's draft statements of work and task orders and made the final decision as to what task orders to issue, what contract vehicles to use and what language to include in the task orders. Id. at 262, ln. 13-15; id. at 286, ln. 21-24; id. at 288, ln. 24-25. Prior to the issuance of individual task orders, Hamilton had no guarantee that it would receive any financial advisory subcontract work under the Section 8(a) contract. Tr. 11/3/2003 AM at 267, ln. 22  268, ln. 15; id. at 296, ln. 3-19; Ervin Ex. 194 at 9628-9629.
6. Williams, Adley Selects Hamilton as Subcontractor on HUD Contract
Williams, Adley selected Hamilton as the subcontractor on its financial advisory services contract with HUD. Tr. 10/30/2003 AM at 117, ln. 21  118, ln. 1; Tr. 7/19/2004 at 97, ln. 19-24. HUD contracting personnel subsequently raised issues with regard to the fees Williams, Adley proposed for Hamilton's work under the Section 8(a) contract, and those fees were the subject *27 of negotiations. Id. Hamilton proposed to charge HUD a fixed percentage per month of the unpaid principal balance of the portfolio being sold for loan sale advisory services performed as a subcontractor to Williams, Adley. Williams, Adley Ex. 27. Adley worked directly with Hancock in "negotiating and working out the details and finalizing the task orders." Tr. 7/19/2004 at 98, ln. 23  99, ln. 5. After the negotiations, HUD's Office of Procurements and Contracts approved all costs in each particular task order. Id. at 99, ln. 8-14. Hancock testified that, based on her independent research, she believed Hamilton's "basis points" pricing methodology was typical for the industry and appropriate under the subcontract with Williams, Adley. Tr. 10/29/2003 PM at 22, ln. 9-19; id. at 25, ln. 13-19; Tr. 10/30/2003 AM at 118, ln. 2-7.
C. Multifamily Note Sales
Beginning in March 1995, Hamilton conducted a series of multi-family note sales,[1] including the West of Mississippi Note Sale, held on September 18-19, 1995, see Ervin Ex. 77 at 2, ¶ 5, and the North and Central Sale, conducted on August 5-6, 1996. See id. at 5, ¶ 18.
1. West of Mississippi Note Sale[2]
On September 18-19, 1995, bidders for the West of Mississippi mortgage loans placed their bids, according to bid specifications set by Hamilton, including instructions that bidders could set bid floors, expressed in terms of minimum unpaid principal balances on the mortgages. See Jan. 7, 2004 Mem. at 9. Hamilton received 400 bids from 73 different bidders for approximately $622 million in unpaid principal balances worth of mortgages. Id. After the bid period closed, Coopers & Lybrand, in its role as subcontractor, transmitted the bid card data to Bell Labs. Id.
a. The Optimization Model Report
Sol Schindler ("Schindler") was head of Bell Labs' subcontracting work for Hamilton during the West of Mississippi sale. Jan. 7, 2004 Mem. at 9. As such, Schindler was in charge of developing and running the optimization model. Id. Schindler applied the computerized optimization model *28 to the data from the bid cards on the afternoon of September 20, 1995. Id. at 9-10. Later that afternoon, Schindler provided a computerized report of the results to Hamilton employee Robert Robinson ("Robinson"). Id. at 10. Robinson was Hamilton's Assistant Treasurer, a member of Hamilton's Board of Directors and the principal point of contact on the West of Mississippi sale between Hamilton and Bell Labs. Id. at 8. Accompanying the report was an e-mail from Schindler to Robinson, stating that "[t]his looks suspicious and should be checked." Hamilton Ex. 44. In response, Robinson immediately instructed Schindler to re-run the optimization model. Tr. 10/31/03 PM at 151, ln. 9-18. Robinson directed that the model used by Bell Labs calculate winning bids as a function of the unpaid principal balance owed on the mortgages, rather than as a function of the gross revenue generated by the bids, or "revenue model," used by Schindler for the initial run.[3]See Ervin Ex. 77 at 3, ¶ 6. Unable to create an "unpaid principal balance model" in the time frame required by Hamilton, Schindler instead adapted the revenue model to approximate an unpaid principal balance model and re-processed the bids, according to Robinson's instructions. Id. ¶¶ 7-8; Hamilton Ex. 45. Schindler forwarded the new results to Robinson with a cover e-mail stating, "I changed the minimum revenue to minimum [unpaid principal balance] by prorating as a temporary fix." Hamilton Ex. 45.
b. Hamilton Reports Results to HUD
Hamilton reported the results of the West of Mississippi note auction sale, as calculated by Bell Labs' second optimization run, to HUD on Friday, September 22, 1995. Jan. 7, 2004 Mem. at 15. "Hamilton reported gross proceeds, as determined by the optimization model, of $385,196,928.49. HUD relied upon Hamilton's statements in choosing the optimal bidders on its loan sales." Id.
c. The Coopers & Lybrand Fax
About a week after Hamilton reported the West of Mississippi sale results to HUD, Michael Brocks, of Coopers & Lybrand, sent a fax to Henry Fan, of Hamilton, indicating that something appeared wrong with the optimization results. Jan. 7, 2004 Mem. at 8. Michael Brocks ("Brocks") was a certified public accountant. Id. "His primary role in the West of Mississippi sale was to establish procedures and protocols so that bids could be processed in an orderly and secure fashion." Id. Henry Fan ("Fan") earned a PhD from the Massachusetts Institute of Technology and began working for Hamilton in August of 1995. Id. The West of Mississippi sale was Fan's first note sale project work for Hamilton. Id. As Brocks recalled at trial, he:
started thinking that I remember seeing a bid that was sizable, that stuck out in my mind during the auction [ALI # 3]. *29 And I wondered why they didn't win. I just thought they should win. So I prepared this Excel analysis which is on Page 2 of [Ervin Ex. 78] and from  again, it appeared that ALI [# 3] should have won because their bid exceeded the others by $2 million.
Tr. 10/30/03 PM at 101, ln. 25  102, ln. 7.
Brocks forwarded to Fan the Excel analysis, which compared the winning bids, as determined by Bell Labs, with ALI # 3 for each of the notes covered by the ALI # 3 bid. See Ervin Ex. 78 at 22652. The winning bid in Brocks' version of the optimization report yielded $2,554,001.00 less revenue than the ALI # 3 bid. See id.
Fan responded to Brocks' fax by telephone. Tr. 10/30/03 PM at 107, ln. 7-8. Fan stated that while he understood what Brocks was trying to do, Brocks' calculations would have to consider the effect of bid floors and other bids to get a truly correct answer. Id. at 107, ln. 11-16. Brocks did not take any further actions regarding the West of Mississippi bid results following this conversation with Fan. Id. at 107, ln. 23  108, ln. 1. Brocks did not inform anyone of his fax (or its substance) other than Fan and one junior Hamilton employee.[4] Tr. 10/30/03 PM at 108, ln. 7, 22-109; Tr. 10/31/03 AM at 172, ln. 6-13.
d. Post-Auction Review of West of Mississippi Sale
HUD required Hamilton to submit a post-auction review of each sale, including the West of Mississippi sale. Hamilton Ex. 8 at p. C-2, ¶ 1.g. One purpose of the post-auction review was to "document what actually transpired in the [West of Mississippi] sale, and present suggestions for consideration in future sales based on the experiences of the [West of Mississippi] Sale." Hamilton Ex. 167 at H/SM 8939. The West of Mississippi sale occurred in September 1995, but Hamilton did not submit the post-auction review to HUD until August 22, 1996, two weeks after the North and Central Note Sale. See Hamilton Ex. 167.
When Hamilton submitted its initial post-auction review of the West of Mississippi sale, it did not disclose the problems associated with the optimization model that required two separate runs, the latter involving a "temporary fix." See Hamilton Ex. 167 at 15. In the section entitled "Lessons Learned," Hamilton stated, "[b]oth during the [West of Mississippi] Sale and immediately thereafter, members of the Sale Team presented ideas for enhancing the loan sales program." Id. at 17. The document did not disclose the communications between Robinson and Schindler about the need to fix the optimization model so that it would properly calculate bid floors in future sales or the communications between Brocks and Fan.
2. The North and Central Note Sale
a. Bell Labs Applies Wrong Model
Almost one year after the West of Mississippi sale, Hamilton held the North and Central note sale on August 5-6, 1996. Ervin Ex. 77 at 4-5, ¶ 18. As in the West of Mississippi sale, bidders in the North and Central sale were permitted to designate floors expressed in terms of the unpaid principal balances of mortgages. Id. Likewise, the bids were also analyzed by a Bell Labs' optimization model. Id. ¶ 41.
Subsequent to the West of Mississippi sale, Bell Labs created an unpaid principal balance model. Tr. 7/19/2004 AM at 48, ln. *30 1-7. The original revenue model was not destroyed, however. Instead Bell Labs kept both models. Id. at 49, ln. 3-13. Robinson left Hamilton in January 1996. Tr. 10/31/2003 PM at 139, ln. 23-24. Schindler suffered a heart attack shortly after the West of Mississippi sale. Tr. 7/19/2004 at 48, ln. 17-25. Neither Robinson, nor Schindler were involved in the North and Central Note Sale, and neither informed anyone at Hamilton or Bell Labs of the new model. Id. at 49, ln. 5-9. Robinson was not even aware that there was a new model, as he only was informed of the temporary fix by Schindler at the time of the West of Mississippi sale and made no further inquiries. See Ervin Ex. 77 at 3-4, ¶¶ 7-12; Tr. 10/31/2003 PM at 155, ln. 24  156, ln. 5.
Hamilton provided data from the North and Central sale bids to Bell Labs with the instructions to run the same model as was used in the West of Mississippi sale. Tr. 7/19/2004 AM at 49, ln. 10-13. The Bell Labs employees in charge of running the optimization model applied the original revenue model to the North and Central sale bids. Id. New to the multi-family loan sales project, the Bell Labs employees were unaware of both the temporary fix required to convert the revenue model into an unpaid principal balance model during the West of Mississippi sale and of the subsequent creation of the new unpaid principal balance model. See Ervin Ex. 77 at 4, ¶¶ 17-18. As Kevin McMahan, a Hamilton employee in charge of investigating the multifamily mortgage sales, testified, "they simply pulled the wrong one off the shelf and ran it." Tr. 7/19/2004 AM at 49, ln. 5-13.
b. Hamilton Reports Results to HUD
Hamilton provided the results to Cushman & Wakefield, HUD's financial advisor on the North and Central sale. Ervin Ex. 77 at 5, ¶ 18; Ervin Ex. 92 at 12, ¶ 46. HUD awarded the mortgage loans based on the results reported by Hamilton. Ervin Ex. 77 at 5, ¶ 19; Ervin Ex. 92 at 12, ¶ 47. The results reported by Hamilton were $1,511,244.00 less than optimal, however, because the revenue model was used instead of the unpaid principal balance model. Ervin Ex. 77 at 1.
D. Single Family Note Sales
1. Single Family # 1 Note Sale
Hamilton also conducted single family mortgage note sales on behalf of HUD, including the Single Family # 1 Note Sale, held on October 25, 1995. Ervin Ex. 77 at 4, ¶ 14; Hamilton Ex. 169. The goals for the Single Family # 1 sale were to (1) maximize proceeds, (2) maximize negative credit subsidy, (3) reduce the HUD-held inventory; and (4) conduct a competitive auction providing equal opportunity to large and small investors. Hamilton Ex. 229 at HUD/KK 496. Shortly after the sale concluded, Hamilton presented the Single Family # 1 sale bid results to HUD. Hamilton Ex. 228. HUD declined to accept the bids for all of the assets because the amount offered was below HUD's threshold credit subsidy price, which had not been published to bidders. Ervin Ex. 233; Tr. 10/31/2003 PM at 165, ln. 5-23; Tr. 7/19/2004 at 30, ln. 1-6. Had HUD accepted the bids for all the loans in the portfolio, HUD would have been required to receive a Congressional appropriation to make up for the shortfall.[5] Tr. 7/20/2004 *31 at 137, ln. 1-5. To avoid the appropriation, HUD accepted bids for only 9,907 (of the 14,499) loans offered for sale, which resulted in a negative credit subsidy. See Ervin 233; Tr. 7/19/2004 at 30, ln. 17  31, ln. 18. HUD subsequently reoffered the remaining loans so as not to forfeit all the due diligence costs and the expense of conducting a sale. Tr. 7/19/2004 at 30, ln. 17  31, ln. 18.
2. Single Family # 1 Reoffering
On November 6, 1995, HUD reoffered the remaining loans, advising bidders that it had established a floor price equal to 74% of the unpaid principal balance of the loans being reoffered and reserving the right to accept or reject any and all bids if that floor price was not met. Ervin Ex. 233 at 2342. HUD did not receive any adequate offers to purchase the entire lot and was required to select from among several partial bid packages. Tr. 7/19/2004 at 32, ln. 7-14; Hamilton Ex. 231. On or about November 7, 1995, Hamilton presented to HUD four potential award options for the Single Family # 1 Reoffering. Tr. 10/31/2003 PM at 173, ln.8  174, ln. 21; see Hamilton Ex. 231. For each alternative, the slides listed: (1) the number of mortgage notes that would be sold; (2) the unpaid principal balance of the notes sold; (3) the gross proceeds to be received; (4) the gross proceeds as a percentage of unpaid principal balance; and (5) the credit subsidy that would be generated. Hamilton Ex. 231. None of the options was superior to the others in all of the categories. See id. Option # 1 was for 73.11% of the unpaid principal balance of the loans being reoffered, resulting in a positive credit subsidy of $2,295,507. Hamilton Ex. 228 at 508. Option # 4 was for 76.11% of the unpaid principal balance of the loans being reoffered, resulting in a negative credit subsidy of $645,837. Id. at 511.
Hamilton recommended that HUD select "Option # 4," the option with the highest negative credit subsidy. Tr. 7/20/2004 at 137, ln. 6-11; id. at 193, ln. 25  194, ln. 2; id. at 194, ln. 14-20; Tr. 7/19/2004 at 33, ln. 19-22. Contrary to Hamilton's recommendation, Fair Housing Authority Commissioner, Nicolas Retsinas, chose Option #1  the option that sold the most loans and had the highest revenue, but resulted in a positive credit subsidy. Id. at 194, ln.3  195, ln. 3; id. at 137, ln. 13  138, ln. 11; Tr. 7/19/2004 at 33, ln. 6-11; id. at 34, ln. 3-9; Tr. 7/21/2004 at 227, ln. 4-8; Hamilton Ex. 231. Helen Dunlap testified that while the selection involved balancing competing policy interests, for HUD, selling the greatest number of loans was paramount. Tr. 7/20/2004 at 138, ln. 7-8.
The winning bidders in the Single Family # 1 Reoffering were a team comprised of BlackRock Capital Finance ("BlackRock") and Goldman Sachs and Company ("Goldman Sachs"). Hamilton had no business relationship with Goldman Sachs at the time of the Single Family # 1 Reoffering sale. Tr. 7/19/2004 at 27, ln. 10-12; Tr. 10/30/2003 PM at 123, ln. 21-22. There was at least one conversation between a Hamilton employee and a Goldman Sachs employee about the possibility of Hamilton and Goldman Sachs working together on potential new business. Tr. 10/30/2003 PM at 121-23. Hamilton employed BlackRock as a subcontractor on another loan sale, known as the Partially Assisted Loan Sale. Id. at 131, ln. 1-14; Tr. 7/19/2004 at 26, ln. 6-12; Tr. 10/30/2003 PM at 119, ln. 3-11. BlackRock did not *32 bid on the Partially Assisted Loan Sale. Tr. 10/30/2003 PM at 131, ln. 19-23. BlackRock did bid on and win assets in other note sales, including the Single Family # 1 Reoffering. Id. at 119, ln. 3-11. HUD was aware of both BlackRock's subcontract with Hamilton and the fact that BlackRock was a bidder on other loan sales, including the single family note sales. Tr. 7/21/2004 at 224, ln. 20  225, ln. 6; Tr. 7/19/2004 at 26, ln. 3-15; Tr. 10/30/2003 PM at 131, ln. 1-18. In light of this information, HUD discussed with Hamilton the proper steps to ensure that BlackRock did not have access to information on sales where BlackRock might have bid. Tr. 7/21/2004 at 225, ln.7  226, ln. 16. Grace Huebscher testified that it was neither uncommon nor improper in the industry for a competitor to team as a subcontractor on some loan sales and bid on others. Tr. 10/30/2003 PM at 133, ln. 24  134, ln. 3. Hamilton did not have any other business relationships with BlackRock during the course of the Single Family # 1 Reoffering. Tr. 7/19/2004 at 26, ln. 16-18.
E. Crosscutting Task Order
1. The Second Financial Advisory Contracts
In March 1995, HUD solicited competitive offers to acquire the services of a group of replacement financial advisors to succeed Hamilton under the first financial advisor contract. Tr. 10/29/2003 PM at 53, ln. 11  55, ln. 14. Contracts were awarded to multiple firms, including Hamilton and Cushman & Wakefield. Id. The second financial advisory contracts were indefinite delivery-indefinite quantity contracts. Id. at 55, ln. 13-14.
2. Drafting the Crosscutting Task Order
In the early stages of the first financial advisory contract, Hamilton suggested that HUD would benefit from having a crosscutting financial advisor to look across HUD's different portfolios and help advise the agency on how to dispose of its loans. Tr. 7/20/2004 at 142, ln. 22  143, ln. 8; Tr. 11/3/2003 AM at 299, ln. 3-20. The idea of the crosscutting role was shared among the various HUD offices, including HUD's contracting office. Tr. 7/19/2004 at 38, ln. 1-16; see also id. at 35, ln.7  36, ln. 5. The original crosscutting concept involved HUD hiring additional in-house staff to provide advice on the financial management of HUD's disparate portfolios. Ervin Ex. 22. Due to HUD's staffing shortages and the accelerating pace of the loan sales program, however, the agency chose to out source the crosscutting function. Tr. 7/20/2004 at 143-146; Tr. 7/19/2004 at 36, ln. 12-24. On January 22, 1996, HUD prepared a Form 718 Funds Reservation and Contract authority form projecting the cost of the crosscutting task order at $5,000,000.00 per year. Ervin Ex. 172.
Fair Housing Authority Comptroller, Kathy Rock, created a first draft of the crosscutting task order after reviewing old task orders, soliciting input from other HUD employees and receiving input from Hamilton's Fair Housing Authority project manager Kevin McMahan. Tr. 7/21/2004 at 228, ln. 1-10. Rock then circulated her draft to various HUD staff members. Id. at ln. 11-23. After receiving comments, Rock submitted the final draft to HUD's Office of Procurements and Contracts to issue the appropriate requests for proposals. Id. at 229, ln. 1-7.
3. Evaluation of Crosscutting Task Order Technical Proposals
In February 1996, HUD sent requests for proposals to Hamilton, Cushman & Wakefield, First Boston and Ernst & *33 Young, each of whom had been awarded separate financial advisory contracts through a competitive bid process. Id. at 230, ln. 15-18; Ervin Ex. 262. Two of the financial advisors, Hamilton and Cushman & Wakefield, submitted proposals. Tr. 10/29/2003 PM at 58, ln. 18-22, id. at 59, ln. 19-24. Hamilton bid a fixed basis point price of $20,842,000.00 over two years. Hamilton Ex. 7. Cushman & Wakefield bid a fixed basis point price of $8,258,000.00 over two years. Ervin Ex. 258 at 10832.
HUD convened a Technical Evaluation Panel to review the submissions. Ervin Ex. 133 at HUD 075 00768. The panel determined that Hamilton's proposal was technically stronger than Cushman & Wakefield's proposal and unanimously recommended awarding the task order to Hamilton in its March 22, 1996 report. Tr. 7/21/2004 at 232, ln. 4-10; Ervin Ex. 133 at HUD 075 00768  075 00772. Upon further questioning by contract officer Hancock, Rock testified that she informed Hancock that Cushman & Wakefield's proposal was technically unacceptable because it appeared to be in response to a solicitation for financial advisory work on a single sale, rather than a proposal to manage the overall program. Tr. 7/21/2004 at 233, ln. 16-25; id. at 236, ln. 24  237, ln. 10. Hancock subsequently asked the Panel to review its findings and "be clear what characterization you would give each firm's proposal as it relates to whether or not their proposal is an acceptable one or not." Tr. 10/29/2003 PM at 62, ln. 18  63, ln. 1. The Panel submitted a revised report to Hancock, dated April 25, 1996, stating that the Cushman & Wakefield proposal was technically unacceptable and explaining the Panel's rationale. Id. at 63, ln. 2-10; Ervin Ex. 134 at HUD 075 00764  075 00765. Hancock accepted the panel's recommendation and passed it on to her supervisor for review. Tr. 10/29/2003 PM at 73, ln. 7-16. HUD's Office of the Inspector General also met with Panel members, including Rock, to discuss the panel's recommendation and basis for Hamilton's selection. Tr. 7/21/2004 at 235, ln. 3-12.
4. Award of Crosscutting Task Order to Hamilton
Hancock subsequently met with Hamilton representatives to discuss clarifications and revisions to the scope of work in advance of HUD issuing the Crosscutting Task Order. Tr. 7/19/2004 at 40, ln. 18  41, ln. 8; Tr. 11/3/2003 AM at 336, ln. 19-21; Ervin Ex. 142. During the meeting, the group discussed price, the specific language of the task order, and how Hamilton would develop a project plan. Tr. 11/3/2003 AM at 336, ln. 22  337, ln. 1. After the meeting, Hamilton employee Kevin McMahan e-mailed Hancock a black-lined revised statement of work for the crosscutting task order based on the discussions during the meeting. Tr. 7/19/2004 at 43, ln. 15  44, ln. 13; Ervin Ex. 142. HUD's Office of Procurements and Contract incorporated the changes and issued the task order to Hamilton on or about April 25, 1996. Hamilton Ex. 7. The task order provided that Hamilton would be paid $20,842,000.00 over two years, to be paid in monthly installments of $868,417.00. Id.
F. Original Source
1. Ervin's Qui Tam and Bivens Actions
On June 6, 1996, Ervin filed in the instant qui tam action a Complaint naming Hamilton as a defendant based, inter alia, on allegations surrounding the West of Mississippi sale.[6] Specifically, Ervin alleged *34 that Hamilton misapplied a defective optimization model. Hamilton Ex. 3 ¶ 13. Ervin alleged that the computer "optimization model" contained major flaws that resulted in an unfair advantage to certain bidders  bidders who were ultimately improperly awarded mortgages under the note sales. See Ervin's Orig. Compl. ¶ 80 [Dkt. No. 1]. Ervin's original qui tam complaint also alleged corruption in the award of the crosscutting task order, including the improper rejection of Cushman & Wakefield's lower bid on erroneous grounds of technical unacceptability. Id. ¶¶ 101-04. The Bivens complaint alleged fraud in connection with procurements Ervin had bid on or attempted to bid on or had participated in indirectly; specifically, Hamilton's procurement of HUD contracts and financial advisory work, including the Williams, Adley 8(a) contract, the first financial advisory contract and the crosscutting task order. See Bivens Compl. ¶¶ 239-41, 311-12, 543-45. As part of its required disclosures in connection with the qui tam case, Ervin provided the Government with information related to the crosscutting task order and Hamilton's subcontracts with Williams, Adley. See Ervin's Written Discl. of Mat. Evid.
At trial, the HUD Inspector General witnesses, Rudolph Joseph Haban and Judith Hetherton, each stated that their investigations of the allegations in Ervin's qui tam complaint and in the Bivens action occurred only after Ervin supplied the government with copies of the lawsuits and related documents. See Tr. 11/3/03 PM at 219, ln. 2-7, 257, ln. 5-10, 268, ln. 5-19. Hamilton does not dispute that the government investigated allegations against Hamilton only after the filing of Ervin's lawsuits. See Compl., Hamilton Sec. Group, et al. v. Ervin & Assocs., D.C. Superior Court Civ. Action No. XX-XXXXXXX (June 4, 1999) at 6, ¶ 22 ("In August 1996, the HUD Office of the Inspector General opened civil and criminal investigations, ostensibly in response to various of Ervin's allegations.").
2. The Coopers & Lybrand Fax
During discovery in the qui tam and Bivens actions, Ervin obtained a copy of the fax from Brocks to Fan, dated September 25, 1995, and provided this fax to the government on June 23, 1998. See Tr. 11/3/03 PM at 220, ln. 18-19. Prior to receiving it from Ervin, the government did not question either Brocks or Fan about Brocks's fax. See Tr. 11/3/2003 PM at 222, ln.3  225, ln. 21; Hamilton Exs. 169, 200.
3. The Manhattan Project
On or about October 24, 1996, after Ervin filed its original qui tam and Bivens complaints and the government began its investigation of Hamilton, a Hamilton employee, Rick Wolfe, discovered an inconsistency between the terms of the National Performing Multifamily Sale bid package and the formula Bell Labs used to optimize the results in that and subsequent note sales. Ervin Ex. 77 at 2-3, ¶¶ 2-4, 18. On November 11, 1996, an article appeared in the U.S. News and World Report criticizing Hamilton's conduct of the note sales.[7]See Hamilton Ex. 126.[8]
*35 In November 1996, Hamilton assembled a team, nicknamed the "Manhattan Project," to investigate the optimization results reported to HUD in the multifamily note sales. Tr. 7/19/2004 AM at 45, ln. 2-13. Robinson was not part of the Manhattan Project team because he was no longer a Hamilton employee. Id. at 74, ln. 12-17. Manhattan Project team members Michael Dietz and Kevin McMahon interviewed Robinson about his involvement in the West of Mississippi sale. Id. at 74, ln. 24  75, ln. 11.
The Manhattan Project team asked Bell Labs to re-run optimization computations regarding the National Performing sale, the West of Mississippi sale, and the North and Central sale. Ervin Ex. 77 at 5, ¶ 21. On December 20, 1996, Hamilton submitted a report to HUD officials Nicolas Retsinas and Kathy Rock, entitled "Report on Optimization." Ervin Ex. 77. In the Report on Optimization, Hamilton explained that a discrepancy in the floor bid instructions conveyed to Bell Labs by Hamilton caused the West of Mississippi sale to generate revenue that was $2,372,307 less than optimal and the North and Central sale to generate revenue that was $1,511,244 less than optimal.[9]Id. at 1; Tr. 10/31/03 AM at 194, ln. 10-17. The Report on Optimization did not reveal to HUD that Brocks had identified to Fan a potential problem with the optimization results after the West of Mississippi sale. Tr. 10/31/03 AM at 200, ln. 9-14; Ervin Ex. 77.
4. HUD Terminates Hamilton's Contract
On October 17, 1997, Nicolas Retsinas requested that HUD's Office of Procurement and Contracts terminate Hamilton's contract and take all appropriate actions to recover from Hamilton the lost revenue caused by Hamilton's errors on the West of Mississippi and North and Central sales. See Hamilton Ex. 26. Upon learning of Hamilton's errors in the West of Mississippi and North and Central sales, HUD's contracting officer Annette Hancock consulted with her superiors and legal counsel and subsequently terminated Hamilton's contract. Tr. 10/30/03 AM at 97, ln. 4-20.

II. CONCLUSIONS OF LAW
The False Claims Act, 31 U.S.C. § 3729 et seq. ("the Act") authorizes damages for "reverse false claims." A reverse false claim may be sustained against one who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government." 31 U.S.C. § 3729(a)(7). Generally, in order to prevail on a reverse false claim, a relator must sustain its burden of proving by a preponderance the following eight elements:
(1) the Relator is the original source; and the Defendant
(2) Knowingly
(3) Made, Used, or Caused to be Made or Used; a
(4) Record or statement that was
(5) False
(6) To a material fact; that
(7) Damages were suffered by the United States through the concealment, avoidance, or decrease of an obligation *36 to pay or transmit money or property to the Government; and that
(8) the Defendant was the direct cause of the damages.
See John Boese, Sample Jury Instructions in a Qui Tam Case, App. F., p. F-30 (collecting cases).
The parties agree that seven of the elements apply to this case. They disagree, however, as to the whether materiality is a required element. Ervin argues that "[m]ateriality is not a required element" in a False Claims Act action. Ervin's Pr. Find./Concl. at 36-38 [Dkt. No. 405]. The Court rejects this argument. The great weight of case law holds that the materiality of a false record or statement is an element of False Claims Act liability. See, e.g., United States v. Data Translation, Inc., 984 F.2d 1256, 1267 (1st Cir.1992) (holding that a false statement that is not material does not support liability under the post-1986 False Claims Act); Tyger Constr. Co. v. United States, 28 Fed. Cl. 35, 55 (1993) (holding that "the FCA covers only those false statements that are material"); United States v. Intervest Corp., 67 F.Supp.2d 637, 646 (S.D.Miss.1999) (stating that "the False Claims Act imposes a materiality requirement"). But see United States ex rel. Roby v. Boeing Co., 184 F.R.D. 107, 112 (S.D.Ohio 1998) (holding without explanation that in light of the Supreme Court's decision in United States v. Wells, 519 U.S. 482, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997), there is no separate materiality requirement under the False Claims Act).
The Supreme Court, in two recent opinions, established a three-part test for determining whether materiality is an element of a federal statute. See Neder v. United States, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); United States v. Wells, 519 U.S. 482, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997). If Congress has not explicitly legislated materiality as an element of the offense materiality can be inferred, provided that the common law at the time the statute was enacted demonstrates a well-settled meaning of a term used by Congress for which materiality was an element. Neder, 527 U.S. at 21-22, 119 S.Ct. 1827. If a term used by Congress had a well-settled meaning which included materiality, the court presumes that Congress intended to incorporate materiality. Id. The Congressional presumption may be rebutted if the text or structure of the statute demonstrates that implying a materiality requirement is inconsistent with the language of the statute. Id. at 23-24, 119 S.Ct. 1827. Although instructive, neither of these decisions specifically addressed the materiality requirement under the False Claims Act.
The Southern District of Texas, in United States ex rel. Wilkins v. North Am. Constr. Corp., 173 F.Supp.2d 601 (S.D.Tex.2001), conducted an exhaustive analysis of the False Claims Act in light of Wells and Neder. See Wilkins, 173 F.Supp.2d at 618-30. The court concluded that materiality is an element of a civil False Claims Act action.
The meaning of the terms used in the relevant provisions supports the conclusion that "false or fraudulent claim" includes an implicit requirement of materiality under the FCA. Although a "false claim" is not identical to a "fraudulent claim," neither the statute, its legislative history, nor the case law supports a reading that dispenses with a showing of materiality for one but requires it for the other. Liability for both a "false claim" and a "fraudulent claim" implicitly requires a showing that what makes the claim either "false or fraudulent is material to the asserted claim of entitlement to receive money or property from the government."
*37 Id. at 630. The court observed that "[t]he False Claims Act is a statutory cause of action intended from its inception to combat fraud against the government." Id. at 619. The court further stated that "[t]he common law definitions of `false,' `fraudulent' and `claim' and the manner in which `false claim' was used in common law jurisprudence are consistent with implicitly including materiality as an element of the FCA." Id. at 628. The court included reverse false claims under Section 3729(a)(7) because Congress intended that section to treat "an individual who makes a material misrepresentation to avoid paying money owed to the Government... as if he submitted a false claim to receive money." Id. at 630 (quoting S. Rep. no. 99-345, at 18, U.S.Code Cong. & Admin.News 1976, p. 5266). The Court is persuaded by the Wilkins Court's well reasoned analysis.
The Court, thus, proceeds to analyze whether Ervin sustained its burden on the eight requisite elements for each of the four remaining claims.
A. The North and Central Note Sale
1. Original Source
By statute, there is no jurisdiction over a qui tam action "based upon the public disclosure of allegations or transactions ... unless ... the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A). The Act defines "original source" as an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government before filing an action. 31 U.S.C. § 3730(e)(4)(B). "Direct knowledge" is knowledge " `marked by the absence of intervening agency.'" United States ex rel. Alexander v. Dyncorp, Inc., 924 F.Supp. 292, 300 (D.D.C.1996) (citation omitted). "Independent" means that the relator's knowledge is not dependent on public disclosures. Id. These jurisdictional requirements serve to ensure that the Act's rewards are available only where, at the time the qui tam claims were filed, the federal government was not already "on the trail" of the alleged wrongdoing. See United States ex rel. Fine v. Sandia Corp., 70 F.3d 568, 571 (10th Cir.1995) (citing United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 655 (D.C.Cir.1994)).
The Court's May 1, 2003 Order[10] reviewed the three requirements as applied to the facts alleged and concluded "that Ervin's pleadings reflect compliance with the jurisdictional requirements of § 3730(e)(4), sufficient to withstand the present motion to dismiss [Ervin's] claims." During trial, it remained incumbent upon Ervin to demonstrate that the original source requirements are satisfied.
a. D.C. Circuit Law
This Circuit has adopted a two-part test to assess the qualification of a qui tam relator under § 3730(e)(4). The reviewing court must first determine whether the "allegations or transactions" that form the basis for the suit were publicly disclosed "in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media." 31 U.S.C. § 3730(e)(4)(A). If the answer to that question is affirmative, the court will continue with the "original source" inquiry. See Springfield Terminal Ry. Co., 14 F.3d at 651. This court's May 1, 2003 Order concluded that Ervin's allegations are *38 "based upon" publicly disclosed information; thus, the key inquiry is whether Ervin is the "original source."
As mentioned above, in order to qualify as an "original source," Ervin must have demonstrated at trial that it had "direct" and "independent" knowledge of the fraud, and that it "voluntarily" provided information to the United States.
I. Direct Knowledge
A relator has "direct knowledge" of any information gleaned from direct observation and analysis, as that information was acquired without any "intervening agency." Alexander, 924 F.Supp. at 300. Courts have allowed a plaintiff to proceed with a qui tam suit based on information uncovered during an investigation undertaken by that same plaintiff. For example, in Springfield Terminal Ry. Co., the D.C. Circuit held that the plaintiff qualified as an original source when it obtained essential information through "its own efforts and experience, which ... included personal knowledge of the [] proceedings and interviews with individuals and businesses identified in the [] records." 14 F.3d at 657. Similarly, Ervin's investigation of the alleged impropriety involving the note sales was facilitated by its prior experience with HUD and its expertise in housing matters. See also Cooper ex rel. United States v. Blue Cross & Blue Shield of Fla., Inc., 19 F.3d 562, 568 (11th Cir.1994) (finding "direct knowledge" when relator acquired information through three years of his own research prior to public disclosure); United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1161 (3d Cir.1991) (stating that plaintiffs may qualify as relators if their information results from their own investigations); Lamers v. City of Green Bay, 998 F.Supp. 971, 983 (E.D.Wis.1998) (noting that "an `investigation' undertaken at the relator's own initiative may form the basis for a qui tam action.").
Ervin maintains that it satisfies the "direct knowledge" requirement because, through personal observation and analysis, and through its own research and investigation, it acquired knowledge of Hamilton's fraudulent conduct. Ervin's uncontroverted contention that its own investigatory efforts led to the filing of the qui tam and Bivens actions was buttressed by the testimony of the HUD Inspector General witnesses, both of whom admitted that their investigation of Hamilton stemmed from the allegations in Ervin's qui tam and Bivens complaints. See Tr. 11/3/03 PM at 219, ¶¶ 2-7, 257, ¶¶ 5-10, 268, ¶¶ 5-19; see also Compl., Hamilton Sec. Group, et al. v. Ervin & Associates, D.C. Superior Court Civ. Action No. XX-XXXXXXX (June 4, 1999) at 6, ¶ 22.
ii. Independent Knowledge
There remains the question of whether the evidence introduced at trial showed that the allegations in the Second Amended Complaint were based on knowledge "independent" of any public disclosures. Typically, the jurisdictional bar applies where the publicly disclosed information "`could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing....'" Springfield Terminal Ry. Co., 14 F.3d at 654 (quoting United Sates ex rel. Joseph v. Cannon, 642 F.2d 1373, 1377 (D.C.Cir.1981)). As the D.C. Circuit stated in United States ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d 675 (D.C.Cir.1997), "the public disclosure bar [] limits qui tam jurisdiction to those cases in which the relator played a role in exposing a fraud of which the public was previously unaware." Id. *39 at 678. This Circuit has recognized, however, that Congress has not specified "by mathematical formulae the quantum or centrality of nonpublic information that must be in the hands of the qui tam relator in order for suits to proceed." Springfield Terminal Ry. Co., 14 F.3d at 653. The "direct and independent knowledge" requirement "refers to direct and independent knowledge of any essential element of the underlying fraud transaction...." Id. at 657 (emphasis in original).
To be sure, between Ervin's June 1996 filing of its original qui tam complaint, and its filing of the Second Amended Complaint in September 1999, Ervin, Hamilton, and HUD OIG were all investigating possible errors or impropriety involving the optimization model. During this time period, Ervin continued its investigation of the note sales by conducting its own research, including several FOIA requests. Some of these requests piggy-backed upon other disclosures that had been made: for example, after more specific allegations of bid-rigging were made in a newspaper article that ran in The Washington Times on October 20, 1997, Ervin directed a FOIA request to HUD, requesting documents and other information referenced in the article. See May 1, 2003 Mem. at 13. It appears that at least some of the allegations in the Second Amended Complaint were supported by information that was publicly disclosed.
Ervin argues, however, that it is entitled to proceed as a relator based on the allegations in its original qui tam complaint, which it argues were "independent" of any public disclosures. Ervin's original complaint alleged that Hamilton had acted improperly by misapplying a flawed optimization model, and by misleading the public about the fairness of the auctions. Orig. Compl. at ¶¶ 13, 79-85 [Dkt. No. 1]. The Written Disclosure of Material Evidence Pursuant to 31 U.S.C. § 3730(B)(2), which was filed with the original complaint, explains that the allegations regarding the optimization model were supported by a "[c]opy of the mathematical formula for the optimization model [and by] Ervin's analysis of the optimization model." Ervin's Written Discl. of Mat. Evid. at 3. Other allegations in the original complaint were similarly supported by individual sources, documentary evidence, and Ervin's analysis. Id. To the extent that Ervin may have relied on facially innocuous documents obtained under FOIA, such "disclosures" do not necessarily bar qui tam jurisdiction. As the D.C. Circuit explained in Springfield,
[k]nowledge of the allegedly misrepresented state of affairs  which does not necessarily entail knowledge of the fact of misrepresentation  is always in the possession of the government.... Publication of the facially valid [documents], already in the government's pocket, cannot by itself be sufficient to defeat qui tam jurisdiction. Indeed, the entire qui tam regime is premised on the idea that the government's knowledge of misrepresented claims against the federal fisc (without knowledge that they are misrepresented) does not in itself translate into effective enforcement of the laws against fraud.
14 F.3d at 656 (emphasis in original). Therefore, although the government had physical possession of some of these documents and turned them over pursuant to FOIA requests, Ervin's own analysis and research brought the allegedly fraudulent activity to the government's attention. In other words, Ervin's original complaint contained essential elements of the allegedly fraudulent transaction  it identified the alleged perpetrator, and the scheme in general terms. Although Ervin may have enhanced its case with subsequent public disclosures, its original complaint set the *40 government "on the trail," prompting an investigation of possible improprieties involving the auctions.[11]Fine, 70 F.3d at 571.
iii. Voluntarily Provided
In order to qualify as an "original source," a relator must have "voluntarily provided the information to the government before filing an action...." 31 U.S.C. § 3730(e)(4)(B). Senator Grassley, one of the authors of the 1986 Amendments, described the purpose of § 3730(e)(4)(B)'s disclosure requirement as follows:
In the definition of `original source,' the requirement that the individual `voluntarily' informed the Government ... is meant to preclude the ability of an individual to sue under the qui tam section of the False Claims Act when his suit is based solely on public information and the individual was a source of the allegations only because the individual was subpoenaed to come forward. However, those persons who have been contacted or questioned by the Government ... and cooperated by providing information which later led to a public disclosure would be considered to have `voluntarily' informed the Government ... and therefore considered eligible qui tam relators.
132 Cong. Rec. 20536 (1986).
Ervin argues that it "provided the information to the government long before it filed its amended complaint and long before any alleged public disclosures." Ervin's Mem. in Opp. to Motion to Dismiss at 18 n.12. [Dkt. No. 140]. Ervin notes that "[t]he United States was served both with the original complaint and a Written Disclosure of Material Evidence in June 1996." Id. In fact, Attachment 1 to Ervin's Second Amended Complaint details the information that Ervin provided before filing the amended complaint. The record indicates that Ervin cooperated with the government (without need for a subpoena) and provided the government with information as it became available. See Tr. 11/3/03 PM at 219, ln. 2-7, 220, ln. 18-19, 257, ln. 5-10, 268, ln. 5-19. The Court concludes that because Ervin presented evidence sufficient to prove that it had direct and independent knowledge of the fraud alleged, and that it provided that information voluntarily to the United States, that it satisfied the jurisdictional requirements of § 3730(e)(4).
2. "Knowingly" (Scienter Requirement)
To prove that Hamilton "knowingly" presented a false or fraudulent claim, Ervin must establish that Hamilton
(1) ha[d] actual knowledge of the information;
*41 (2) act[ed] in deliberate ignorance of the truth or falsity of the information; or
(3) act[ed] in reckless disregard of the truth or falsity of the information.
31 U.S.C. § 3729(b). Concerning the North and Central sale, Ervin argues that Hamilton and its subcontractors[12] "act[ed] with reckless disregard of the truth or falsity of the ... North/Central Sale Optimization Results." Ervin's Pr. Find./Concl. at 32 (Nov. 12, 2003) [Dkt. No. 405].
The "reckless disregard" prong of the definition for the term "knowingly" as used in the False Claims Act, 31 U.S.C. 3729 et seq., was enacted in a 1986 amendment to the federal statutory code. As described by what appears to be the only congressional report accompanying the bill:
S. 1562 defines this obligation as to make such inquiry as would be reasonable and prudent to conduct under the circumstances to ascertain the true and accurate basis of the claim. Only those who act in gross negligence of this duty will be found liable under the False Claims Act.

* * * * * *
the constructive knowledge definition attempts to reach what has become known as the ostrich type situation where an individual has `buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted. While the Committee intends that at least some inquiry be made, the inquiry need only be `reasonable and prudent under the circumstances', which clearly recognizes a limited duty to inquire as opposed to a burdensome obligation.
S. Rep. 99-345, at 20, 1986 U.S.C.C.A.N. 5266, 5285 (internal quotation marks omitted). Reckless disregard, as used in the False Claims Act, "lies on a continuum between gross negligence and intentional harm." United States v. Krizek, 111 F.3d 934, 941 (D.C.Cir.1997) (internal citation omitted) (emphasis added). As the D.C. Circuit noted in Krizek,
the best reading of the Act defines reckless disregard as an extension of gross negligence. Section 3729(b)(2) of the Act provides liability for false statements made with deliberate ignorance. If the reckless disregard standard of section 3729(b)(3) served merely as a substitute for willful misconduct  to prevent the defendant from "deliberately blind[ing] himself to the consequences of his tortious action"  section (b)(3) would be redundant since section (b)(2) already covers such struthious conduct. Moreover, as the statute explicitly states that specific intent is not required it is logical to conclude that reckless disregard in this context is not a "lesser form of intent," but an extreme version of ordinary negligence.
Id. at 942; see also id. at 943 (upholding district court's application of standard as expressed as "gross negligence plus"); accord United States ex rel. Aakhus v. DynCorp, 136 F.3d 676, 682 (10th Cir.1998); UMC Elecs. Co. v. United States, 43 Fed. Cl. 776, 792 n. 15 (1999).
In its January 7, 2004 Order, the Court denied Hamilton's motion for *42 partial judgment with respect to Count IX, related to the North and Central note sale. The Court stated that "[t]hat transaction occurred arguably after Hamilton should have known enough about all of the errors and problems with the West of Mississippi sale to place the burden on Hamilton to demonstrate that the error's replication is not actionable gross negligence in the extreme." Jan. 7, 2004 Order. Hamilton failed to present any evidence to rebut Ervin's prima facie showing of gross negligence with respect to the North and Central sale. Hamilton argues that the problems with the North and Central sale were due solely to a "failure to have adequate backup lines of communication." Hamilton's Mod. Pr. Find./Concl. at 30 [Dkt. No. 446]. The standard of reckless disregard, however, was designed to address the refusal to learn of information which an individual, in the exercise of prudent judgment, should have discovered. Crane Helicopter Servs., Inc. v. United States, 45 Fed. Cl. 410, 433 (Fed.Cl.1999). Thus, "the statute covers not just those who set out to defraud the government, but also those who ignore the obvious warning signs." Id. Hamilton, in the exercise of prudent judgment, or even judgment short of reckless disregard, should have capitalized on the knowledge of the key employees involved in the West of Mississippi sale to prevent the same optimization errors from re-occurring during the North and Central sale.
In United States ex rel. Compton v. Midwest Specialties, Inc., 142 F.3d 296 (6th Cir.1998), the United States Court of Appeals for the Sixth Circuit held that a supplier "knowingly" made a false claim to the government, where the supplier delivered goods to the government knowing the goods had not been tested and without knowing de facto whether the goods otherwise conformed to specifications. Id. at 303-04. Analogously, here Hamilton "knowingly" made a false claim to the government, where it delivered the results of the North and Central optimization sale to the government, knowing that it had not consulted the key players involved in the previous sale to ensure that any problems with the West of Mississippi sale were resolved prior to the North and Central sale and without knowing de facto whether the optimization model otherwise conformed to HUD's specifications. See also Larry D. Barnes, Inc. v. United States, 45 Fed.Appx. 907, 914 (Fed.Cir.2002) (holding that contractor's submission of an ordinary change order claim was reckless under the FCA because the contractor failed to verify the claim's underlying assumptions); United States v. Cabrera-Diaz, 106 F.Supp.2d 234, 238-39 (D.Puerto Rico 2000) (holding that defendant's billing secretary's failure to document time charges for anesthesiology services before submitting Medicare reimbursement claims was reckless under the FCA); Krizek, 111 F.3d at 942 (holding that physician's "shodd[y] recordkeeping," which led to inflated Medicare reimbursement claims, was reckless under § 3729(b)).
Ervin presented evidence that, during the West of Mississippi sale, both a Hamilton employee (Robinson) and an employee of Hamilton's sub-contractor, Bell Labs (Schindler), discovered an error in the optimization model used in multifamily sales. Ervin Ex. 77 at 2-3, ¶¶ 5-6. Robinson made no effort subsequent to the West of Mississippi sale, however, to ensure that the problem with the optimization model was permanently rectified. Tr. 10/31/2003 PM at 155, ln. 24  156, ln. 5. Robinson did not contact Schindler, or anyone else at Bell Labs, to determine if an unpaid principal balance model was created for subsequent sales. Id. Similarly, Robinson failed to inform any other Hamilton employees or HUD, of the nature of the problem with *43 the West of Mississippi sale or the need to ensure that Bell Labs corrected the West of Mississippi optimization errors before the next multifamily note sale. Tr. 7/19/2004 AM at 75, ln. 1-7. Hamilton, although required to prepare and submit a post-auction review report to HUD, failed to debrief Robinson, Hamilton's principal point of contact with Bell Labs, or Schindler, the individual responsible for preparing the optimization analysis, after the West of Mississippi sale. As Kevin McMahon testified, he learned about Robinson's knowledge of the West of Mississippi problems and the need to fix the optimization model only during an interview of Robinson during the Manhattan Project investigation. Tr. 7/19/2004 AM at 49, ln. 5-13; 75, ln. 6-7. Thus, in the post-auction review report issued to HUD, Hamilton made no mention of the need to modify the optimization model and re-run the model during the West of Mississippi sale. See Hamilton Ex. 167.
Likewise, although as Hamilton points out, Schindler did create a permanent upaid principle balance model, Schindler did not discard the original revenue model. See Tr. 7/19/2004 AM at 49, ln. 3-13. Nor did Schindler inform anyone at Bell Labs of the problems with the West of Mississippi optimization model or the creation of the unpaid principal balance model to permanently rectify the problem. See id. Furthermore, Schindler never followed up with Robinson, or anyone else at Hamilton, to inform them of the new model or ensure that the new model accurately reflected Hamilton's requirements.[13] Ervin Ex. 77 at 4, ¶ 12.
As evidenced by his fax to Henry Fan shortly after the West of Mississippi sale, Michael Brocks was also aware of at least a potential problem with the optimization analysis. See Ervin Ex. 78. Although Brocks was ultimately persuaded that his excel analysis may not have accurately calculated the optimal bids, neither Brocks initial misgivings, nor the existence of his fax to Fan were disclosed prior to the North and Central sale. As with Robinson and Schindler, Brocks was not debriefed after the West of Mississippi sale as part of the post-auction review process. See Tr. 10/31/2003 AM at 223, ln. 17  224, ln. 4.
As Ervin demonstrated, there was no evidence of any communication between the West of Mississippi and North and Central note sales teams regarding the optimization problems during the West of Mississippi sale, despite the fact that Hamilton not only had the opportunity, but was required, to perform and submit a written summary of a post-auction review of the West of Mississippi sale. Hamilton Ex. 8 at C-2, ¶ 1.g. One of the purposes of the post-auction review was to use the "Lessons Learned" on the West of Mississippi sale to improve future sales. Hamilton Ex. 167 at 8. Hamilton, thus, "failed to make simple inquiries which would [have] alert[ed]" Hamilton that there was a problem with the optimization model prior to the North and Central sale. See Covington v. Sisters of the Third Order of St. Dominic of Hanford, 1995 WL 418311, at *4 (9th Cir. July 13, 1995). This clearly constituted "gross negligence plus."
3. "Makes, Uses, or Causes to be Made or Used" a "Record or Statement"
Not all false records or statements are actionable under the False *44 Claims Act. "Rather, there must be a claim `for payment or approval.'" See United States ex rel. Bettis v. Odebrecht Contractors of California, Inc., 297 F.Supp.2d. 272, 278 (D.D.C.2004) (internal citations omitted). As a result, only actions which cause the government to pay out money where it is not due, or actions which deprive the government of money it is lawfully owed, are considered claims within the meaning of the False Claims Act. Id. (noting that under the remedial nature of the statute, "a submission need not be an actual invoice to be a `claim' or a `statement'...").
It is undisputed that Hamilton submitted a record or statement to HUD, in the form of the North and Central note sale auction's "optimized" results report. See Ervin Ex. 77 at 5, ¶ 18. Hamilton stipulated to this fact in its suit against the government, arising out of the same factual circumstances as this case. See Ervin Ex. 92 at 12, ¶¶ 46-47 ("On or about August 6, 7 or 8, 1996, [Bell Labs] reported the results of its running of the optimization model to Hamilton, which in turn provided them to Cushman & Wakefield, the Financial Advisor for the North /Central Sale, which in turn provided them to HUD.... HUD awarded the mortgages based upon the bid results [provided by Hamilton].").[14] HUD relied on the report in selecting the winning bidders in the North and Central sale. See Ervin Ex. 77 at 5, ¶ 19; Ervin Ex. 92 at 12, ¶ 47. In other words, HUD relied on Hamilton's representations that this was the optimal mix of bidders maximizing the number of loans sold and revenue to HUD.
4. Falsity
A relator must establish that the record or statement submitted to HUD was false. 31 U.S.C. § 3729(a)(1); see, e.g., United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc., 238 F.Supp.2d 258, 265 (D.D.C. Dec.18, 2002) ("False Claims Act liability attaches to one who `causes to be presented' a false claim.").
Here, although purporting to submit a report to HUD of the bidders in the North and Central sale whose bids maximized the number of loans sold and proceeds to HUD, Hamilton submitted a false record to HUD in so far as it contained a list of bidders whose bids did not meet the stated criteria. Hamilton admitted as much in its December 20, 1996 Memorandum to HUD, stating that, due to an error in the optimization process, the results of the North and Central sale produced revenue that was $1,511,244.00 less than optimal. Ervin Ex. 77 at 1. According to a declaration by Kathy Rock, the Government Technical Monitor on HUD's contract with Hamilton, in support of HUD's motion for summary judgment in a Freedom of Information Act suit arising out of the multifamily note sales,[15]
HUD used an optimization model to determine the combination of individual bids and pool bids that maximized both the number of loans sold and the proceeds to HUD and the federal taxpayers.
HUD's financial advisor scanned the bid cards it received and then transmitted the bids in electronic format to [Bell *45 Labs], which created and maintains the optimization model. [Bell Labs] ran the bids through the optimization model and submitted a report of the results to HUD the identities of the bidders whose bids would maximize both the number of loans sold and the proceeds to HUD and the federal taxpayers and the prices they paid for loans or pools of loans.
Hawthorn, 1997 WL 821767, *2, 1997 U.S. Dist. LEXIS 21491 at *5-6 (quoting initial declaration of Kathy Rock) (emphasis added); see Tr. 7/21/2004 AM at 276, ln. 16  277, ln. 16.
Subsequently, Rock submitted a supplemental declaration stating that,
[Hamilton] has advised HUD that, because of an error in the instructions that [Hamilton] provided to [Bell Labs] for the optimization model, the results of the optimization as reported to and accepted by HUD did not fully maximize the proceeds to HUD for this sale ... The error in the North and Central sale, therefore, resulted in decreased proceeds to HUD of $1,511,244 or 2/10ths of one percent.
Hawthorn, 1997 WL 82176, *3, 1997 U.S. Dist. LEXIS 21491 at *8 (quoting Kathy Rock's supplemental Declaration). Thus, the uncontroverted evidence is clear that Hamilton's Report on Optimization for the North and Central sale was a false representation of the optimal bidders.
5. Materiality
As discussed above, the False Claims Act imposes liability only for material misrepresentations. United States v. TDC Mgm't Corp., 288 F.3d 421, 426 (D.C.Cir.2002); United States ex rel. Barrett v. Columbia/HCA Health Care Corp., 251 F.Supp.2d 28, 33 (D.D.C.2003) (citing United States ex rel. Berge v. Bd. of Trs. of the Univ. of Ala., 104 F.3d 1453, 1459 (4th Cir.1997)). For a violation to give rise to false claims liability under this theory, compliance with the presented claim must have been so important to the contract that the government would not have honored the submission for payment on the claim if it were aware of the violation. TDC Mgm't Corp., 288 F.3d at 426 (holding the defendant liable for omitting information "indicating that it was acting in a manner that was contrary to the core terms of the Program.").
Here, HUD announced in its solicitation package for the North and Central sale that "[b]ids will be evaluated in a manner that optimizes the gross proceeds to FHA from the sale of the Mortgage Loans collectively." Hamilton Ex. 161 at H/SM 13630; see also id. at H/SM 13722. HUD was required to adhere to the valuation scheme set forth in the solicitation package. See Multimax, Inc. v. Fed. Aviation Admin., 231 F.3d 882 (D.C.Cir.2000). HUD relied on Hamilton to manage the North and Central sale in accordance with the specifications in the bid package and to present HUD with a list of bidders that optimized the gross proceeds to HUD. Hamilton submitted a list of bidders to HUD that it specifically claimed represented the bidders in the North and Central sale whose bids maximized the number of loans sold and proceeds to HUD. See Ervin Ex. 77 at 1; Hawthorn, 1997 WL 821767, *2, 1997 U.S. Dist. LEXIS 21491 at *5-6 (quoting initial declaration of Kathy Rock). HUD made its determinations with respect to the winning bids based on Hamilton's representations, i.e. that the list of bidders represented bids that, if accepted, would maximize proceeds to HUD. Ervin Ex. 77. As Hamilton subsequently revealed, however, Hamilton's list of bidders did not meet the stated criteria. Id. at 1.
Hamilton argues that the optimization errors in the North and Central sale *46 amounted to only 0.2% of total revenue and thus, are not material. Hamilton Mod. Pr. Find./Concl. at 25-26 [Dkt. No. 446]. Materiality, however, is not determined with reference to dollars or percentages of an overall transaction. Rather, "the materiality of a false statement turns on `whether the false statement has a natural tendency to influence action or is capable of influencing agency action.'" United States ex rel. Berge v. Trs. of Univ. of Ala., 104 F.3d 1453, 1460 (4th Cir.1997) (internal citation omitted); see Hays v. Hoffman, 325 F.3d 982, 992 (8th Cir.2003) (noting that false claim material if it was "capable of influencing the government's payment decision"). Ervin established at trial that Hamilton's false optimization results in the North and Central note sales not only had a tendency to, but actually did, influence HUD's decision as to who was awarded the North and Central loans. See Ervin Ex. 92 at 12, ¶ 47.
Furthermore, Ervin presented strong evidence that HUD would not have accepted the erroneous result, foregoing $1,511,244.00 in additional revenue, if HUD had been aware of the optimization error prior to awarding the loans. Upon learning of the optimization error, HUD actually sued Hamilton for the lost revenue. HUD's contracting officer, Annette Hancock, testified that after she received the December 20, 1996 report from Hamilton, detailing the optimization errors, she terminated Hamilton's contract and asserted a damage claim against Hamilton for the losses due to the optimization errors in the West of Mississippi and North and Central sales. Tr. 10/30/03 AM at 97, ¶¶ 4-20.
Thus, Hamilton's false statement, i.e. its report to HUD of the optimal bids that were not in fact "optimal," was material for purposes of Ervin's False Claims Act claim.
6. Damages were Suffered by the United States Through the Concealment, Avoidance, or Decrease of an Obligation to Pay or Transmit Money or Property to the Government[16]
a. Obligation
The parties clash over whether there was an "obligation to pay or transmit *47 money or property to the government" within the meaning of section 3729(a)(7). Central to the dispute is whether the Loan Sale Agreement ("LSA") between the highest bidder and HUD created an "obligation" under section 3729(a)(7). In United States v. Pemco Aeroplex, Inc., 195 F.3d 1234 (11th Cir.1999), the United States brought a "reverse false claim" action against an aircraft maintenance contractor, alleging that the contractor knowingly misidentified aircraft wings on an inventory schedule before purchasing them for scrap value from the United States. Id. at 1235. The defendant argued that it was under no pre-existing "obligation to return or pay for the wings at the time it submitted the inventory schedule." Id. at 1237. Thus, according to the defendant, the submission of the inventory schedule was merely an offer to purchase the excess wings; it did not establish either an obligation to purchase or the specific purchase price. Id. ("[T]his offer created only a contingent obligation to purchase  dependent on the government's inspection of the property and acceptance of [defendant's] offer."). In reversing the district court's dismissal for failure to state a claim, the United States Court of Appeals for the Eleventh Circuit held that the government sufficiently alleged that the defendant had an obligation to account for the full value of any excess government property by returning that property or otherwise disposing of it in accordance with the government's instructions. Id. Submitting the inventory form was simply part of fulfilling the pre-existing obligation. Id.
Likewise, here, under the terms of the LSA, a bidder was required and obligated to submit a full deposit to HUD, and proceed to closing, if its bid was accepted. Hamilton Ex. 161. At the moment that the bidder submitted its bid package to HUD containing an executed LSA, it was legally obligated to complete the sale. Id. at H/SM 13634, 13725-13727. The LSAs were executed prior to the sales, thus, an "obligation" to pay the amount identified in each bid was present at the time the results were reported to HUD. Id. at H/SM 13713.
Hamilton argues that the LSAs created no liability to the government on behalf of any bidder, unless and until HUD selected *48 that bidder as the winner. The LSAs stated, for example, that "[a]ll evaluations and determinations made by HUD as to which bid(s) optimizes the sale proceeds to HUD from the sale of Mortgage Loan(s) shall be in HUD's sole and absolute discretion" and that "HUD reserves the right to accept or reject any and all bids made in connection with the Auction, including the Bidder's Bid." Hamilton Ex. 161 at H/SM 13723. As stated in the Court's September 20, 2003 Order, however, Hamilton concedes that correcting the optimization errors would have resulted in the selection of winning bidders generating an additional $1,511,244 in the North and Central sale. Sept. 22, 2003 Order at 6 [Dkt. No. 325]. Furthermore, HUD did not actually have total discretion to knowingly award loans on terms other than those announced in the solicitation package, i.e., accept bids that did not optimize the gross proceeds to the Fair Housing Authority. Hamilton Ex. 161. Under the section entitled "Bid Evaluation," the North and Central Package advised bidders: "Bids will be evaluated in a manner that optimizes the gross proceeds to FHA from the sale of the Mortgage Loans collectively." Id. at H/SM 13630; see also id. at H/SM 13722. HUD was required to adhere to the evaluation scheme set forth in the solicitation document. See Multimax, Inc. v. Fed. Aviation Admin., 231 F.3d 882 (D.C.Cir.2000). Although HUD had some discretion to reject bids, it would have been unlawful for HUD to knowingly award loans to other than the optimal mix of bidders as announced in the evaluation criteria.
b. Damages / Causation
Hamilton's Manhattan Project team concluded that the results reported in August 1996 to HUD for the North Central sale were $1,511,244.00 less than optimal. See Tr. 10/31/2003 AM at 194, ln. 14-17; Ervin' Ex. 77 at 18 ("North and Central MF Sale: The sale produced revenue of $621,674,221 and the Lucent/Bell Labs result generated using the [unpaid principal balance] floor is $623,185,465. The difference is $1,511,244 or 2/10ths of one percent."). HUD only realized value from the sales if the sales closed. As Judge Braden noted in her opinion covering the same factual terrain, "[a]ll of the wining bidders in the North/Central sale closed." Hamilton Sec. Advisory Servs., Inc. v. United States, NO. 98-169C, 60 Fed. Cl. 144, 153 n. 7 (2004). The Court finds that Ervin has proved by a preponderance of the evidence that the damages caused by the Hamilton's, and its subcontractor's, extreme gross negligence are $1,511,244.00.
Accordingly, based on the record evidence, and for the reasons discussed above, the Court concludes that Ervin has carried its burden of proving by a preponderance of the evidence the requisite elements of a False Claims Act with respect to Count IX, related to the North and Central note sale, and that the "the amount of damages which the Government [has] sustain[ed] for this claim" is $1,511,244  the difference between the amount actually collected by the United States from the bidders named as the winners in the North and Central note sale auction and the amount that would have been collected by the United States but for the extreme gross negligence of Hamilton and its subcontractor that led to the errors associated with the North and Central Note Sale.
7. Damages Assessed Against Hamilton
The question thus arises as to the amount of damages owed by Hamilton. 31 U.S.C. § 3729(a)(7) provides that a person who knowingly makes, uses, or causes to *49 be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,
is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000,[17] plus 3 times the amount of damages which the Government sustains because of the act of that person, except that if the court finds that 
(A) the person committing the violation of this subsection furnished officials of the United States responsible for investigating false claims violations with all information known to such person about the violation within 30 days after the date on which the defendant first obtained the information;
(B) such person fully cooperated with any Government investigation of such violation; and
(C) at the time such person furnished the United States with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced under this title with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation;
the court may assess not less than 2 times the amount of damages which the Government sustains because of the act of the person. A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.
31 U.S.C. § 3729(a)(7) (emphasis added). Hamilton contends that it satisfied all three requirements to reduce the award from treble damages to double damages under the statute. See Hamilton Mem. Regarding Proper Penalty at 4 [Dkt. No. 454]. According to the trial record, however, although Hamilton did eventually furnish the results of the Manhattan Project investigation to HUD officials, it did not disclose all information regarding the errors on the North and Central sale within 30 days after Hamilton first learned of those errors. See 31 U.S.C. § 3729(a)(7)(A). Michael Brocks testified that Hamilton employee Rick Wolfe discovered an error in the optimization model in October 1996. Tr. 10/31/2003 AM at 189, ln. 16-23; see also Tr. 11/3/2003 AM at 307, ln. 4-12; Ervin Ex. 77 at 5, ¶ 20. Tests were conducted by Bell Labs shortly thereafter to confirm that the optimization model employed during the North and Central sale did not actually yield "optimized" results. Ervin Ex. 77 at 5, ¶ 21. This was not disclosed to HUD officials until December 5, 1996. Ervin Ex. 77 at 5, ¶ 21.
Furthermore, although there is evidence that Hamilton cooperated with the Government investigation of the multifamily note sales, see Tr. 7/19/2004 AM at 81, ln. 2-9; Hamilton Exs. 168, 169, 200, Hamilton did not disclose the North Central problems to the HUD Office of Inspector General or Department of Justice, despite being aware that the Government was conducting an investigation into the note sales at the same time Hamilton conducted its Manhattan Project investigation. See Tr. 11/3/2003 PM at 258, ln. 6-14; Tr. 7/19/2004 AM at 81, ln. 2-9. As the Supreme Court made clear in Vermont Agency of Nat'l Res. v. United States, 529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d 836 *50 (2000), the statutory reduction from treble to double damages only applies in "some of those (presumably few) cases involving defendants who provide information concerning the violation before they have knowledge that an investigation is underway." Id. at 786 n. 16, 120 S.Ct. 1858 (parenthetical in original). Accordingly, the amount of damages is trebled, under 31 U.S.C. § 3729(a), to $4,533,732.00.
With respect to the civil penalty, the penalty may attach to each instance in which a party "knowingly ... causes to be made or used a ... fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2). The False Claims Act defines a claim as:
any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.
31 U.S.C. § 3729(c). While the Court may assign multiple penalties, each penalty must be attached to an identifiable demand for payment or claim made. See United States v. Krizek, 111 F.3d 934, 938 (D.C.Cir.1997). The parties agree, and the Court concurs, that Hamilton is subject to one civil penalty in this case. See Joint Suppl. Brief of United States and Ervin at 1 [Dkt. No. 455]; Hamilton's Mem. Regarding Proper Penalty at 6 [Dkt. No. 454]. Because the Court finds liability for the North and Central note sale predicated on a lesser degree of scienter  namely reckless disregard, rather than "actual knowledge," or "deliberate ignorance," 31 U.S.C. § 3729(b)  the Court assesses a civil penalty of $5,000.00. Thus, the total damage award assessed against Hamilton is $4,538,732.00.
8. Division of Damage Award Between Ervin and the United States
Under 31 U.S.C. § 3729(d)(2), where the Government elects not to intervene in a False Claims Act action, the relator is entitled to an amount "not less than 25 percent and not more than 30 percent" of the proceeds. Ervin and the Department of Justice have stipulated and agreed that Ervin will receive 29% of the damages and fines collected by the United States pursuant to this Court's judgment, exclusive of Ervin's attorney's fees and costs. See Joint Suppl. Brief of United States and Ervin at 2 [Dkt. No. 455]; Suppl. Report by United States at 1 [Dkt. No. 460]. Accordingly, the Court awards Ervin 29% of the damages assessed against Hamilton, totaling $1,316,232.28. The Court awards the Government the remaining 71% of the damages assessed against Hamilton, totaling $3,222,499.72.
B. Single Family Note Sale # 1 Reoffering and Williams, Adley Section 8(a) Contract
As detailed above, the test for False Claims Act liability is whether there was a false or fraudulent claim, record, or statement, made with the requisite scienter, that was material, and that caused the government to pay out monies or to forfeit monies due. 31 U.S.C. §§ 3729(a)(1), (a)(2), (a)(7).
1. False Claim, Statement or Record
Thus, the False Claims Act attaches liability not to fraudulent activity but to false claims, statements or records resulting from that activity. See United States ex rel. Totten v. Bombardier Corp., 286 F.3d 542, 551 (D.C.Cir.2002). To prove a False Claims Act allegation, therefore, *51 a relator must produce evidence that the defendant actually submitted false demands for payment or submitted false records or statements in order to get a false claim paid. See United States ex rel. Ortega v. Columbia Healthcare, Inc., 240 F.Supp.2d 8, 18 (D.D.C.2003). It is not enough "`to describe a private scheme in detail but then to allege simply and without any stated reasons for his belief that claims requesting illegal payments must have been submitted.'" United States ex rel. Aflatooni v. Kitsap Physicians Servs., 314 F.3d 995, 1002 (9th Cir.2002) (citation omitted).
With respect to the Single Family Note Sale # 1 Reoffering, Ervin's claim centers on the allegation that Hamilton recommended to HUD that it award assets to the bidders identified in Option # 1, rather than those in Option # 4. Ervin alleges that the latter option would have resulted in greater revenue to HUD in the form of a negative credit subsidy. Ervin Pretrial Statement at 5. Ervin maintains that, in making this recommendation, Hamilton sought to influence the outcome of the Single Family # 1 Note Sale Reoffering in favor of BlackRock and Goldman Sachs, because of Hamilton's pre-existing relationship with both companies. Id. The uncontroverted trial evidence, however, clearly indicates that Hamilton recommended Option # 4. It was HUD's Commissioner, Nicolas Retsinas who, contrary to Hamilton's recommendation, made an "active and clear" decision to select the option that sold the most loans, Option # 1. Tr. 7.20.2004 at 137, ln. 14-20.
In light of the evidence that Hamilton, in fact, recommended Option # 4, Ervin alternatively argues that Hamilton's submission of Option # 1 as one of the four potential options for HUD's consideration constituted a false record because it did not meet the predetermined threshold price of 74% of the unpaid principal balance of the loans being reoffered. Ervin's Mod. Pr. Find./Concl. at 41 [filed under seal, not yet docketed]. Again, Ervin maintains that Hamilton included Option # 1 in order to influence the selection in favor of BlackRock and Goldman Sachs. The lynchpin of this claim is completely undermined by the uncontroverted evidence that Hamilton recommended Option # 4, not Option # 1. Furthermore, according to HUD's stated criteria in the bid package for the Single Family # 1 Reoffering, HUD reserved the right to accept or reject any and all bids if the 74% floor price (in terms of unpaid principal balance) was not met. Ervin Ex. 233 at 2341-2342. HUD did not indicate that it would definitely reject any bids that did not meet the 74% threshold. In fact, as Hamilton was well aware, HUD had multiple goals for the single family note sales: (1) maximize proceeds, (2) maximize negative credit subsidy, (3) reduce the HUD-held inventory; and (4) conduct a competitive auction providing equal opportunity to large and small investors. Hamilton Ex. 229 at HUD/KK 496. Out of all the options presented, Option # 1 sold the most loans and generated the highest gross proceeds, which met two of the stated goals for the single family note sales. See Hamilton Ex. 228 at HUD/KK 508-511. Hamilton presented detailed briefing slides of all four options, clearly indicating to HUD that Option # 1 resulted in a positive credit subsidy. See Hamilton Ex. 231. There was no credible evidence presented at trial that Hamilton acted improperly in submitting the four options to HUD or otherwise sought to influence the selection process in favor of Option # 1.
2. Conflict of Interest
A government contractor's failure to disclose an organizational conflict of interest constitutes a false claim under the *52 False Claims Act. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 916-17 (4th Cir.2003); see also United States ex rel. Cantekin v. Univ. of Pittsburgh, 192 F.3d 402, 414-15 (3rd Cir.1999).
HUD's first Financial Advisor contract with Hamilton defined an organizational conflict of interest as, among other things, "a situation in which the nature of work under a Government contract and a Contractor's organizational, financial, contractual or other interests are such that ... [t]he Contractor's objectivity in performing the contract work may be impaired." Hamilton Ex. 8 at I-1 (quoting 48 C.F.R. 2452.209-72(a)). Ervin maintains that Hamilton failed to disclose organizational conflicts of interest with respect to its Hamilton's relationships with both BlackRock and Goldman Sachs. See Ervin's Mod. Pr. Find./Concl. at 42 [filed under seal, not yet docketed]. Specifically, Ervin claims that Hamilton did not disclose to HUD that Hamilton corresponded with Goldman Sachs concerning the possibility of working on potential new business prior to the Single Family # 1 Reoffering. Id. at 41-42. Ervin further claims that Hamilton was also pursuing other business deals with BlackRock at the time of the Single Family # 1 Reoffering. Id. Contrary to Ervin's contentions, however, Hamilton did not fail to disclose any organizational conflicts of interest. HUD was fully aware of BlackRock's subcontract with Hamilton on the Partially Assisted Note Sale. In fact, the record indicates that HUD and Hamilton specifically discussed steps to make sure BlackRock did not have access to information on any sales on which it might be a bidder. At the time of the Single Family # 1 Reoffering, this was the only business relationship between Hamilton and BlackRock established at trial. Moreover, Hamilton did not have any existing business relationship with Goldman Sachs at the time of the Single Family Reoffering. Ervin presented evidence of only one conversation between a Hamilton employee and a Goldman Sach's employee concerning the possibility of working on potential new business. Tr. 10/30/2003 PM at 121-23. This falls far short of evidencing a relationship that might have impaired Hamilton's objectivity. Accordingly, Ervin's claim that Hamilton filed a false conflict of interest certification is without merit.
Ervin, thus, failed to satisfy its burden at trial to establish by a preponderance of the evidence that Hamilton submitted a false claim, statement or record in connection with the Single Family Note Sale # 1 Reoffering.
C. Williams Adley 8(a) Contract
As with the Single Family Note Sale # 1 Reoffering, Ervin failed to prove that Hamilton submitted a false claim, statement or record to HUD with respect to the Williams, Adley Section 8(a) Contract. Counts XIII and XIV of the Second Amended Complaint allege that Hamilton solicited and received a "kickback" of guaranteed subcontracting work from Williams, Adley and that Hamilton and Williams, Adley submitted exaggerated pricing estimates for task orders under the contract. Sec. Am. Compl. ¶¶ 198-203. Ervin claims that Hamilton and Williams, Adley formed a secret exclusive subcontracting agreement and that Hamilton manipulated the Section 8(a) procurement process to avoid competing for loan sale advisory work. Tr. 10/29/2003 AM at 23, ln. 2-5.
Ervin presented no evidence, however, that Hamilton and Williams, Adley conspired to evade procurement regulations. Nor did Ervin present any evidence that Hamilton failed to properly perform the financial advisory work under the subcontract according to the government's standards. HUD contracting officer Hancock *53 testified that she ensured the appropriate policies and procedures were adhered to and complied with in the award of the Section 8(a) contract. Tr. 10/30/2003 AM at 109, ln. 23  110, ln.1. Hancock knew Hamilton was serving as financial advisor on the loans sales both when Williams, Adley submitted its November 2, 1994 proposal naming Hamilton as a potential subcontractor and when the Section 8(a) contract was awarded. Tr. 10/30/2003 AM at 110, ln. 2-8; id. at 115, ln. 19-21; Williams, Adley Ex. 27. Issues were raised with regard to the fees Williams, Adley proposed for Hamilton's work under the Section 8(a) contract, and those fees were the subject of negotiations. Tr. 10/30/2003 AM at 117, ln. 21  118, ln.1; Williams; Adley Exs. 72, 95. Hancock testified that when she reviewed the file and signed the award, she was satisfied that the proposed prices were appropriate. Tr. 10/30/2003 AM at 118, ln. 2-7. Ervin adduced no evidence to the contrary. Thus, Ervin's allegations regarding the Section 8(a) contract do not state a coherent theory of how HUD was fraudulently induced to pay or forego money. See Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 788 (4th Cir.1999) (holding that payment or forfeiture of funds by the government in reliance on a material false statement is an essential element of false claims liability); see also Aflatooni, 314 F.3d at 1002.
Ervin, thus, failed to satisfy its burden at trial to establish by a preponderance of the evidence that Hamilton submitted a false claim, statement or record in connection with the Williams, Adley Section 8(a) Contract.
D. Crosscutting Contract
1. Conspiracy to Rig Competition for Crosscutting Task Order
To prove a False Claims Act allegation, a relator must produce evidence that the defendant actually submitted false demands for payment, or submitted false records or statements in order to get a false claim paid. See United States ex rel. Ortega v. Columbia Healthcare, Inc., 240 F.Supp.2d 8, 18 (D.D.C.2003). As the Court previously observed, however, "`[c]laims for payment submitted to the government pursuant to a fraudulently obtained contract violate the FCA, even if the claims themselves do not contain false statements.'" Sept. 22, 2003 Order at 9 [Dkt. No. 325] (quoting United States ex rel. Alexander v. Dyncorp, Inc., 924 F.Supp. 292, 298 (D.D.C.1996)).
Counts XV and XVI of the Second Amended Complaint, allege that Hamilton provided a "kickback" in the form of a promise of future employment to Fair Housing Authority Controller, Kathy Rock in exchange for rigging the competition for the Crosscutting Task Order in favor of Hamilton. See Ervin's Sec. Am. Compl.; Tr. 10/29/2003 AM at 23, ln. 16-20. Ervin, however, failed to present sufficient evidence at trial of any collusive relationship between Rock and Hamilton. Rock was only one member of the Technical Evaluation Panel that recommended Hamilton be awarded the Crosscutting Task Order. Tr. 7/21/2004 at 40, ln. 18-41, ln. 8. The Panel determined that the only other bidder, Cushman and Wakefield's proposal for the Crosscutting Task Order was technically unacceptable. Tr. 10/29/2003 PM at 63, ln. 2-10; Ervin Ex. 134. Ervin did not call any of the other Panel members as witnesses and introduced no evidence to suggest any undue influence on the Panel by Rock. Ervin also failed to produce any evidence of the job offer Hamilton allegedly made or promised to Rock.
Furthermore, a review of the actual evidence presented reveals that the award of *54 the Crosscutting Task Order was scrutinized in advance, not only by Fair Housing Authority Program Staff but by the Office of the Inspector General and the Office of Procurements and Contracts. Ervin Exs. 133, 134, 139; Tr. 7/21/2004 at 233, ln. 16-20; Tr. 10/29/2003 PM at 73, ln. 7-16; Tr. 7/19/2004 at 40, ln. 18  41, ln. 8; Tr. 11/3/2003 AM at 130, ln. 16-21. In fact, HUD contracting officer Annette Hancock testified that there was no evidence that the competition for the Crosscutting Task Order was rigged or slanted in Hamilton's favor or that members of the Panel were under any influence or pressure to find Hamilton's offer superior to that of Cushman & Wakefield's. Tr. 10/20/2003 AM at 137, ln. 2-10. Ervin failed to present sufficient evidence to controvert Hancock's testimony. Moreover, Ervin presented no evidence that Hamilton did not perform its work on the task order fully and satisfactorily.
Thus, Ervin failed to establish that Hamilton colluded with Kathy Rock or that Hamilton otherwise fraudulently obtained the Crosscutting Task Order or submitted any false claim with respect to its performance under the task order.
2. Failure to Disclose Conflict of Interest
a. Duty to Disclose Conflict of Interest
Failure to disclose a conflict of interest may constitute of false claim for purposes of False Claims Act liability. See United States ex rel. Cantekin v. Univ. of Pittsburgh, 192 F.3d 402, 414-15 (3rd Cir.1999). A defendant, however, incurs False Claims Act liability for failure to disclose information only where the defendant had a legal obligation to disclose the omitted information. United States ex rel. Berge v. Board of Trustees of the University of Alabama, 104 F.3d 1453, 1459 (4th Cir.1997).
Unable to establish any collusive relationship between Hamilton and Rock, Ervin now maintains that Hamilton submitted a false claim by falsely certifying that it did not have an unfair competitive advantage in bidding on the Crosscutting Task Order. Specifically, Ervin claims that a conflict of interest arose when Hamilton bid on the Crosscutting Task Order after one of Hamilton's employees submitted input on the task order to Rock, who was tasked with drafting the task order. See Ervin's Mod. Pr. Find./Concl. at 34-35 [filed under seal, not yet docketed]. Ervin cites Federal Acquisition Regulation ("FAR") § 9.505-2(b)(1) as the basis for its claim, which excludes certain government contractors from bidding on contracts where they participated in the drafting of the statement of work. Section 9.505-2(b)(1) states that
If a contractor prepares, or assists in preparing, a work statement to be used in competitively acquiring a system or services  or provides material leading directly, predictably, and without delay to such a work statement  that contractor may not supply the system, major components of the system, or services....
48 C.F.R. § 9.505-2(b)(1). Sections 9.505-2(b)(1)(ii) and (b)(3), however, specifically excepts certain government contractors from the prohibitions of Section 9.505-2(b)(1)  specifically, contractors who have participated in the development and design work of the contract under which the work statement was drafted. See id. at § 9.505-2(b)(1)(ii) and (b)(3). The language of the provision plainly contemplates the situation where a firm wishes to compete for a contract for a system or services based on that firm's earlier development and design work. The rationale for allowing development *55 and design contractors to participate in this manner is stated in Section 9.505-2(a)(3):
In development work, it is normal to select firms that have done the most advanced work in the field. These firms can be expected to design and develop around their own prior knowledge. Development contractors can frequently start production earlier and more knowledgeably than firms that did not participate in the development, and this can affect the time and quality of production, both of which are important to the Government. In many instances the Government may have financed the development. Thus, while the development contractor has a competitive advantage, it is an unavoidable one that is not considered unfair; hence no prohibition should be imposed.
48 C.F.R. § 9.505-2(a)(3). Thus, the competitive advantages afforded the contractor in such situations are not prohibited as unfair because they are both unavoidable and advantageous to the government.
The record is undisputed that Hamilton, as HUD's financial advisor, served as a development and design contractor for HUD's loan sales program. Tr. 10/31/2003 PM at 259, ln. 3-14 ("[Hamilton] provided advice to HUD in connection with developing a loan sale program."); id. at 331, ln. 22  332, ln. 3 ("Was Hamilton asked to develop and design the whole loan sales program? Yes, I believe they were."); Tr. 7/20/2004 at 122, ln. 16-22 ("The initial role was to design ..."); Tr. 11/3/2003 AM at 331, ln. 22  332, ln. 3. In this capacity, Hamilton advised HUD on how to deal with its portfolio and developed strategies for a successful loan sales program. Early on in its first financial advisor contract, Hamilton advised HUD that it needed a crosscutting financial advisor who could look across HUD's different portfolios and help advise the agency on how to dispose of its loans. Tr. 11/3/2003 AM at 299, ln. 3-20. HUD eventually procured the services of a crosscutting financial advisor under the second financial advisor contract. Tr. 10/29/2003 PM at 55, ln. 15  56, ln. 3. As a development and design contractor, Hamilton was permitted to and successfully did compete for the Crosscutting Task Order.
Thus, there was no conflict of interest based on a violation of FAR 9.505-2(b)(2), and Ervin failed to present sufficient evidence that Hamilton otherwise failed to disclose a conflict of interest with respect to the Crosscutting Task Order. Accordingly, Ervin failed to establish by a preponderance of the evidence that Hamilton submitted a false claim, record or statement for purposes of False Claims Act liability.
b. Damages
Under the False Claims Act, damages must be proven with reasonable certainty. Thus, a relator must establish both that the fact of the damages is certain and that the amount of damages can be reasonably computed. See John T. Boese, Civil False Claims and Qui Tam Actions, Appendix F: Sample Jury Instructions (2) in a Reverse False Claim Case. In United States ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908 (4th Cir.2003), the Fourth Circuit explained that damages are properly measured "by the amount of money the government paid by reason of the false statement above what it would have paid absent the false statement." Id. at 922.
The relator in Harrison had alleged that the defendant submitted a false claim by failing to disclose an organizational conflict of interest by its subcontractor. Id. According to the Court,
*56 the district court properly required the plaintiff to prove damages by showing how much more the government paid [the defendant's subcontractor] to perform the subcontract than it would have paid another firm absent the false no-[organizational conflict of interest] certification. Although [the defendant] ran afoul of the fair bidding requirements, there was no evidence adduced at trial suggesting that [the defendant's subcontractor] failed to perform the work that it was required to perform under the subcontract or that the government did not receive the benefit of the work performed.
Id. Thus, absent any evidence of a lower bid by a viable candidate, or evidence that the contractor had not satisfactorily performed its work under the contract, the Court of Appeals affirmed the trial court's finding of no damages for the FCA violation.
Likewise, even if Ervin established that Hamilton submitted a false claim, record or statement to HUD by violating FAR 9.505-2(b)(2) or otherwise failing to disclose a conflict of interest, it failed to prove actual damages with reasonable certainty. Ervin claims that damages on its Crosscutting Task Order claim should be measured as the difference between the price of Hamilton's bid and the bid submitted by Cushman and Wakefield. As in Harrison, this measure of damages is inappropriate because, according to the evidence presented at trial, Cushman and Wakefield's bid was rejected by the Panel as technically unacceptable. Furthermore, Ervin presented no evidence that Hamilton did not fully perform its duties to the satisfaction of the government under the Crosscutting Task Order.
Ervin, thus, failed to prove any actual damages, as required to sustain a False Claims Act claim.
E. Counts X, XI, and XII of Ervin's Second Amended Complaint
Ervin failed to present evidence at trial with respect to Counts X, XI and XII of its Seconded Amended Complaint. Accordingly, Counts X, XI and XII are dismissed.

III. CONCLUSION
To recap, for the reasons discussed above I conclude that: (1) Ervin has carried its burden of proving by a preponderance of the evidence the requisite elements of a False Claims Act with respect to Count IX, related to the North and Central note sale; (2) the "the amount of damages which the Government [has] sustain[ed] for this claim" under 31 U.S.C. § 3729 is $1,511,244.00; (3) the total damage award assessed against Hamilton, including penalties, is $4,538,732.00; (4) Ervin is entitled to 29% of this award under 31 U.S.C. § 3729(d)(2), totaling $1,316,232.28, and the United States is entitled to the remaining $3,222,499.72; (4) Ervin has failed to establish liability under the False Claims Act with respect to Count II (related to the Single Family Offering), Counts XIII and XIV (related to the Williams, Adley 8(a) contract), and Counts XV and XVI (related to the cross-cutting contract); (5) Ervin failed to present evidence at trial with respect to Counts X, XI, XII, which are accordingly dismissed; and (6) Hamilton's Motion for Summary Judgment on Count IX of the Second Amended Complaint is dismissed.
An Accompanying Order and Judgment will issue consistent with this Memorandum.

ORDER AND JUDGMENT
On August 16, 2004, the Court filed an Order and Partial Judgment [Dkt. No. 452] that (1) entered Judgment for Ervin *57 and Associates, Inc. ("Ervin") on Count IX of the Second Amended Complaint [Dkt. No. 276], related to the North and Central Note Sale; (2) entered Judgement for Hamilton Securities Group, Inc. ("Hamilton") on Count II of the Second Amended Complaint [Dkt. No. 276], related to the Single Family Offering; (3) entered Judgment for Hamilton on Counts XIII and XIV of the Second Amended Complaint [Dkt. No. 276], related to the Williams, Adley 8(a) Contract; and (4) entered Judgment for Hamilton on Counts XV and XVI of the Second Amended Complaint [Dkt. No. 276], related to the cross-cutting contract.
In that same Order, the Court ordered supplemental briefing on (1) the proper penalty to be assessed under 31 U.S.C. § 3729; and (2) the proper division of payment as between Ervin and the United States. For reasons explained in an accompanying memorandum, it is this 25th day of January 2005 hereby
ORDERED: that the Memorandum filed today supersedes the Memorandum filed on August 16, 2004 [Dkt No. 453];
ORDERED: that Hamilton pay a total damage award, including penalties under 31 U.S.C. § 3729, of $4,538,732.00; it is further
ORDERED: that Ervin is entitled to 29% of this award under 31 U.S.C. § 3729(d)(2), totaling $1,316,232.28; it is further
ORDERED: that the United States is entitled to the remaining 71% of this award, totaling $3,222,499.72; it is further
ORDERED: that Counts X, XI and XII of the Second Amended Complaint [Dkt. No. 276] are DISMISSED; and it is further
ORDERED: that Hamilton's Motion for Summary Judgment on Count IX of the Second Amended Complaint [Dkt. No. 438] is DENIED.
NOTES
[1] In March 1995, Hamilton conducted its first multi-family note sale, the Southeast Multifamily Sale. Ervin Ex. 77 at 2, ¶ 1. After this sale, Hamilton recommended that bidders have the option to set bid "floors," expressed as a function of the total unpaid principle balance owed on the mortgages. "For example, if a bidder specified a bid floor of $100 million [unpaid principal balance], but the optimization model selected that bidder as the winner of notes with a [unpaid principal balance] totaling only $90 million, that bidder would be awarded no notes. On the other hand, if that bidder was selected as the winner of notes with a total [unpaid principal balance] of $110 million, it would be awarded all of those notes." Jan. 7, 2004 Mem. at 7 n.7. Bidders, thus, "were not forced to take smaller amounts of assets than they desired." Ervin Ex. 77 at 2, ¶ 1. In August 1995, Hamilton conducted the National Performing multifamily note sale, which was the first multifamily sale in which bidders were allowed to express bid floors. Id.
[2] In granting Hamilton's Rule 52(c) Motion for Judgment on Partial Findings with respect to Ervin's claims arising out of the West of Mississippi Note Sale, the Court made specific findings of fact in its January 7, 2004 Memorandum regarding the West of Mississippi Note Sale, which are hereby incorporated by reference. See Jan. 7, 2004 Mem. No evidence adduced by either party during the trial defense undermined the Court's January 7, 2004 findings of fact with respect to the West of Mississippi Note Sale. To the extent that the events surrounding the West of Mississippi note sale are relevant to Ervin's claim arising out of the subsequent North and Central Note Sale, they are referenced here for ease of exposition.
[3] Although Hamilton introduced the "bid floor" option, expressed in terms of unpaid principal balance owed on the mortgages during the previous National Performing Multifamily Sale, "[c]orrespondence and interaction by and between Hamilton and Lucent/Bell Labs ... refers to a floor expressed in terms of minimum revenue (the price the bidder is offering to pay)." Ervin Ex. 77 at 2, ¶ 2. Thus, the initial "revenue model," developed by Bell Labs to incorporate the bid floors did not accurately account for the fact that bid floors were actually expressed in terms of minimum unpaid principal balance. See id. at 3, ¶ 6. According to Hamilton's December 20, 1996 report to HUD, although this error was not discovered until the West of Mississippi sale, subsequent analysis revealed that the erroneous instructions "caused no impact on the National Performing MF Sale." Id. at 2, ¶ 3.
[4] "In addition to Fan, Brocks also sent the fax to Christine Lord, a junior Hamilton employee who sat near the fax machine in Hamilton's offices. Brocks sent Lord the fax so that she could transmit the document to Fan." See Jan. 7, 2004 Mem. at 14 n.9.
[5] As Helen Dunlap testified, the Fair Housing Authority fund subsidized its losses with tax dollars through credit subsidies. Tr. 7/20/2004 at 136, ln. 20  137, ln. 5. "A negative credit subsidy is when you have a profit on the portfolio, and a positive credit subsidy is when you have a loss on the portfolio... for a negative credit subsidy is [when] the government gets to appropriate less and positive means it has to appropriate more." Id. Within a fiscal year, HUD was permitted to offset positive and negative credit subsidies without the need to seek an appropriation so long as the aggregate annual number after each sale was negative. Id.
[6] Ervin also filed a Bivens complaint on June 5, 1996. The Bivens complaint alleged fraud in connection with procurements on which Ervin had bid or attempted to bid. See Bivens Compl. ¶¶ 239-41, 311-12, 543-45.
[7] There is pending before the Court Civil Action No. 99-CV-1698 (LFO), an action by Hamilton against Ervin charging that Ervin was the source of these published reports and that Ervin tortuously interfered with Hamilton's contract with HUD.
[8] At the conclusion of Ervin's case in chief, the Court indicated that the record would be left open "for the specific purpose of reserving judgment on the admissibility of documents that you cite in your proposed finding." Tr. 11/3/2003 PM at 282, ln. 13-15. Accordingly, the Court now admits the following documents over Hamilton's objection: Hamilton Exs. 26, 126 and 167 and Ervin Ex. 92.
[9] According to the optimization report, "the erroneous instructions caused no impact on the National Performing MF Sale." Ervin Ex. 77 at 2, ¶ 3.
[10] United States ex rel. Ervin & Assoc., Inc. v. Hamilton Sec. Group, Inc., 332 F.Supp.2d 1 (D.D.C.2003) [hereinafter, "May 1, 2003 Order"].
[11] United States ex rel. Barajas v. Northrop Corp., 5 F.3d 407, 411 (9th Cir.1993), held that a party "is `an original source' with respect to a proposed amendment if he played some part, whether direct or indirect, in the public disclosure of the allegations that are the subject of the proposed amendments." In so holding, the Barajas court scrutinized the language and history of § 3730(e)(4)(A). Notably, the court emphasized that the Act refers to "an original source." Id. at 410 (quoting 31 U.S.C. § 3730(e)(4)(A)) (emphasis added). The use of the word "an," the court observed, "suggest[s] there may be more than one original source eligible to bring suit...." Id. The reasoning espoused by the Barajas court supports Ervin's contention that even if it was just one of several sources, this finding would support jurisdiction in this case. Although United States ex rel. Detrick v. Daniel F. Young, Inc., 909 F.Supp. 1010 (E.D.Va.1995), expressed some doubt about the "trigger" theory articulated in Barajas, it acknowledged that "the Rules do not require the complainant to have direct and independent knowledge of everything in his complaint in order to qualify as a relator." Id. at 1021.
[12] In False Claims Act actions, statements of the subcontractor, when submitted by the general contractor, may serve as a basis for liability against the general contractor. See, e.g., Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 793 (4th Cir.1999) ("[W]here the prime contractor allegedly knows that a material certification by a subcontractor was false, we find as a matter of law that the prime contractor has adopted the subcontractor's certification by submitting it to the government."); see also United States ex. rel. Roby v. The Boeing Co., 73 F.Supp.2d. 897, 904 n. 11 (S.D.Ohio 1999).
[13] Schindler suffered a heart attack shortly after the West of Mississippi sale but returned to work at Bell Labs, albeit in a different division, prior to the North and Central sale. Tr. 7/19/2004 AM at 48, ln. 23  49, ln. 2. He was not debriefed by Hamilton or Bell Labs concerning the West of Mississippi sale. Id. at 49, ln. 5-13.
[14] "Although a judicial admission is binding only in the case in which it was made, a court may consider a judicial admission as evidence in another case." In re United Mine Workers of Am. Employee Benefit Plans Litig., 782 F.Supp. 658, 674 (D.D.C.1992).
[15] Hawthorn Mgmt. Servs., Inc. v. Dep't of Hous. & Urban Dev., 1997 WL 821767, 1997 U.S. Dist. LEXIS 21491 (D.Conn. Dec. 18, 1997).
[16] On the eve of its trial defense, Hamilton moved for summary judgment on Count IX of the Second Amended Complaint (related to the North and Central Note Sale), on the grounds that Hamilton was under no contractual obligation to use an optimization model with a "UPB-based bid floor" or to "maximize sales proceeds while still meeting all criteria...." Hamilton's Mot. for Sum. Judg. Brief at 4-5 [Dkt. No. 438]. Hamilton's motion relies on the holding by the United States Court of Federal Claims, in a parallel proceeding between Hamilton and the United States, that neither "the 18505 Contract, nor Task Order 1 concerning the North/ Central sale, required or imposed any legal duty on Hamilton to run an optimization model utilizing bid floors to yield HUD maximum sales proceeds." Id. at Ex. A (Hamilton Sec. Advisory Servs. v. United States, 98-169C (Fed. Ct. Cl. June 12, 2004) (Braden, J.) Mem. Opin. and Final Order Denying Def's. Mot. for Recon. at 2). Hamilton specifically argues that it cannot be subject to False Claims Act liability because it was under no specific, legal duty to employ an unpaid principal balance model and maximize sales proceeds to HUD. Furthermore, Hamilton contends that to find False Claims Act liability predicated on the North and Central sale would be inconsistent with Judge Braden's holding that Hamilton had no contractual duty to run an optimization model utilizing bid floors to yield HUD maximum sales proceeds.

Hamilton misconstrues Ervin's claim. In fact, Count IX does not depend on the existence of an underlying contractual obligation. Hamilton falsely represented to the United States that the results of the North and Central sale were "optimal," that is, the results maximized the revenue to the United States. As the Court recognized in its January 7, 2004 Memorandum, Ervin's North and Central claim is based on Hamilton's false representation that:
the [North and Central] sale presents facts distinct from the West of Mississippi note sale, specifically greater evidence of reckless disregard of the falsity of the representation that the results reported to HUD were "optimal."
Jan. 7, 2004 Mem. at 17, n.11. At trial, HUD Controller, Kathy Rock, confirmed that Hamilton presented a slate of bids that was represented to be the maximum proceeds to HUD. Tr. 7/21/2004 at 277. Hamilton does not dispute that it represented the North and Central sale results as "optimal." Thus, it is this false representation, not a breach of a contractual obligation, that forms the basis of Hamilton's False Claims Act liability. See, e.g., United States ex rel. Schwedt v. Planning Research Corp., 59 F.3d 196 (D.C.Cir.1995) (holding that plaintiff could pursue False Claims Act claims based on contractor's false progress reports even though the court rejected plaintiff's argument that defendant violated contract specifications); United States v. TDC Mgmt. Corp., Inc., 24 F.3d 292, 296 (D.C.Cir.1994) (holding that although submitting inaccurate monthly progress reports to government did not breach the underlying contract, this did not preclude the Government from pursuing a False Claims Act suit based on information omitted from those same progress reports).
Moreover, there is no risk of inconsistent results: this Court's holding that, under the circumstances and based on admissions and witness statements, there was an "obligation" under the False Claims Act, is not in conflict with the Court of Claim's holding that the Contract language itself did not give rise to a requirement that Hamilton run an optimization model utilizing bid floors to yield HUD maximum sales proceeds. Accordingly, Hamilton's motion for summary judgment lacks merit and is denied.
[17] On August 30, 1999, the Department of Justice published a final rule increasing the penalties to a minimum of $5,500 and a maximum of $11,000. 28 C.F.R. § 85.3(9) (2000). The final rule applies only to violations occurring after September 29, 1999 and, therefore, does not apply here.